IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| STANLEY HOWARD, | ) |
| Plaintiff, | ) |
| v. | ) |
| CITY OF CHICAGO, Present and Former Chicago Police Officers JOHN BYRNE, JAMES LOTITO, RONALD BOFFO, DANIEL McWEENY, JOHN PALADINO, ROBERT DWYER, FRANK GLYNN, JON BURGE, LEROY MARTIN, TERRY HILLARD, and other UNKNOWN CHICAGO POLICE OFFICERS, as well as THOMAS NEEDHAM, GAYLE SHINES, COUNTY OF COOK and THE COOK COUNTY STATE'S ATTORNEYS' OFFICE, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

NOV 25 2003

JUDGE ANDERSEN

03C 8481

JURY TRIAL DEMANDED

MAGISTRATE SIDNEY I. SCHEN

## COMPLAINT

NOW COMES Plaintiff, STANLEY HOWARD, by his attorneys, LOEVY & LOEVY, and complaining of Defendants, CITY OF CHICAGO, Present and Former Chicago Police Officers JOHN BYRNE, JAMES LOTITO, RONALD BOFFO, DANIEL McWEENY, JOHN PALADINO, ROBERT DWYER, FRANK GLYNN, JON BURGE, LEROY MARTIN, TERRY HILLARD, and other UNKNOWN CHICAGO POLICE OFFICERS, as well as THOMAS NEEDHAM, GAYLE SHINES, COUNTY OF COOK, and the COOK COUNTY STATE'S ATTORNEYS' OFFICE ("SAO"), states as follows:

1.     This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). The parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## Introduction

3.     In the process of "interrogating" him, several of the Defendant Officers tortured Mr. Howard to the limit of his capacity for pain and fear, after which Mr. Howard agreed to sign a false written confession to a murder which he did not commit.

4.     This police torture to which Mr. Howard was subjected included physical beatings and repeated asphyxiation with a plastic typewriter cover over his head until he lost consciousness (a practice known as "bagging").

5.     It has since been well-documented that Chicago Police Officers in Area 2 under the command of Jon Burge were regularly engaged in this form of torture in the course of interrogating suspects in order to "solve" more crimes.  Indeed, the injuries which befell Mr. Howard (and others) were the direct result of a situation which spun out of control only because Chicago's policymakers chose to turn a blind eye to the rampant abuses under Burge's command.

6.     After Mr. Howard succumbed to the Defendants' torture, the resultant coerced confession was used to convict him unjustly.  Mr. Howard was then sentenced to death for a crime he did not commit.

7.     While Mr. Howard's appeal for post-conviction relief was making its ways through the Illinois courts, then-Governor George Ryan had the occasion to review Mr. Howard's case.  Through the diligent and tireless *pro bono* efforts of attorney Paul E. Dengel and his colleagues at Schiff Hardin & Waite, Mr. Howard was able to demonstrate conclusively to the

2

Governor's satisfaction that his conviction was indeed the product of a complete and total miscarriage of justice.

8.     Accordingly, on January 10, 2003, Governor Ryan issued Mr. Howard a pardon specifically predicated on the "basis of Mr. Howard's innocence." Governor Ryan stated that he had very carefully reviewed Mr. Howard's case (as well as those of three other innocence pardon recipients, namely, Madison Hobley, Aaron Paterson, and Leroy Orange) and had gone over the evidence many times.

9.     Governor Ryan also indicated that he "still ha[s] faith in the system that eventually [Mr. Howard] would have received justice in our courts. But the old adage is true: justice delayed is justice denied."

10.     Elected state governors do not routinely overturn murder convictions. Governor Ryan did so in Mr. Howard's case because the evidence is simply irrefutable that Mr. Howard was framed for a murder he did not commit in the manner described below in this Complaint.

## The Parties

11.     Plaintiff Stanley Howard is 41-years old. He has spent the last fifteen years on Death Row for a crime he did not commit.

12.     Defendant City of Chicago is a municipal entity which employs or employed Defendant Chicago Police Officers John Byrne, James Lotito, Ronald Boffo, Dan McWeeny, John Paladino, Robert Dwyer, and Frank Glynn, all of whom worked in the Chicago Police Department's "Area 2" under Commander Jon Burge.

3

13. Defendants Leroy Martin and Terry Hillard are former Superintendents of the Chicago Police Department, and Defendant Thomas Needham was Hillard's general counsel. Before ascending to the Superintendent position, Martin served as Burge's supervisor in Area 2.

14. Defendant Gayle Shines is the former Chief Administrator of the Chicago Police Department's Office of Professional Standards ("O.P.S."), in which capacity her supervisor was the Chicago Police Superintendent.

15. All of the foregoing individuals are sued in thei individual capacities, and all acted under color of law and in the scope of their employment in engaging in the actions alleged in this Complaint.

16. Defendant Cook County is a governmental body whic consists, in part, of its State's Attorneys' Office.

### Background

17. In the early morning hours of May 20, 1984, Olive Ridgell was murdered as he sat in a parked car with his lover, Tecora Mullen.

18. Both the deceased and Ms. Mullen were married, bu not to each other. In fact, the car in which they were seated when Mr. Ridgell was shot was parked just around the corner fron where Ms. Mullen lived with her husband.

19. A witness who lived near the shooting heard Ms. Mullen plead: "don't hurt him," then "don't hurt him, just take me home," followed by the fatal shot.

20. Another witness who lived nearby also heard a ma
voice state: "I told you I'd catch you motherfuckers," followed
by a single gunshot.

21. Mr. Howard had never met either Ms. Mullen or Mr
Ridgell in his life, and had absolutely nothing to do with this
crime.

### Mr. Howard's Arrest

22. Roughly six months after the Ridgell shooting, a
approximately 6:00 p.m. on November 1, 1984, Mr. Howard was
arrested on an unrelated warrant for a crime that had occurred
some fourteen months prior.

23. Mr. Howard was 21 years-old at the time and had
criminal record other than a theft conviction for which he was
sentenced to two days in jail.

24. After his arrest, Mr. Howard was placed in an
interrogation room where an officer believed to be Defendant
Paladino informed him that he supposedly had been implicated in
an armed robbery of two Chicago Police Officers.

25. Mr. Howard then informed one of the two police
officers who had brought him into the interrogation room that h
wanted an attorney, and he wanted to make a telephone call.
These requests were ignored.

26. At some point thereafter, Defendant McWeeny
entered the interrogation room and told Mr. Howard that he had
been looking for him because Mr. Howard had supposedly "messed
over [McWeeny's] friends." McWeeny proceeded to interrogate Mr
Howard about the armed robbery involving the two Chicago Police

5

Officers, telling Mr. Howard that if he did not return the badges and pistols which McWeeny believed Mr. Howard had taken, then Mr. Howard would be "in more trouble than you can handle."

27. Mr. Howard denied committing the robbery of the two Chicago Police Officers, and he refused to make or sign any incriminating statements.

28. As Mr. Howard was being taken back to the lock-up, another police officer informed Mr. Howard that "before you leave, you will tell us what we need to know."

### Police Torture

29. At some point during the post-midnight hours on November 3, 1984, Defendants Lotito and Boffo took Mr. Howard from the lock-up to an interrogation room, where they handcuffed his hands to a ring on the wall.

30. These two officers, along with Defendant Byrne, told Mr. Howard that they wanted to talk to him about the Ridgell murder. They started the interrogation by explaining to Mr. Howard how the murder had occurred, and asked Mr. Howard whether he wanted to confess to it.

31. When Mr. Howard responded that he had nothing to confess, the Defendants began to beat him. Specifically, they proceeded to slap, punch, and kick him on his leg and midsection.

32. During a pause in the violence, Defendant Lotito held a plastic shopping bag over Mr. Howard's head, but because it was not airtight, Mr. Howard was still able to breathe. Lotito then put a plastic typewriter cover over Mr. Howard's head and held it tight around Mr. Howard's neck. While doing so,

6

Lotito lifted Mr. Howard off his feet, causing the handcuffs to dig into Mr. Howard's wrists.

33. Unable to breathe because of the plastic typewriter cover over his head, Mr. Howard blacked out.

34. The Defendants then slapped Mr. Howard's face until he regained consciousness, whereupon they again asked Mr. Howard if he was ready to confess. Mr. Howard did not confess, because he was innocent.

35. The Defendants then resumed the beating, striking Mr. Howard primarily in the stomach and chest.

36. When the Defendants started to put the plastic typewriter cover over Mr. Howard's head for another round of asphyxiation, Mr. Howard succumbed out of fear for his life. At that point, Mr. Howard told the Defendants he would tell them whatever they wanted him to say. He did so, however, only because of the torture, and because of his fear that they would eventually kill him if he continued to resist their attempts to coerce his confession.

37. Two witnesses in the lock-up area who observed Mr. Howard shortly after the beating (Byron Hopkins and Theodore Hawkins) both corroborated that Mr. Howard appeared battered when he emerged from the interrogation room, and a third witness heard Mr. Howard's screams. One of these witnesses also observed a police officer emerge from the room with the plastic cover and put it back over a typewriter.

38. Moreover, by the time Mr. Howard was sent to the Cook County Jail after his "confession," medical professionals

7

noted and documented new injuries on his body which further corroborated the beating. These new injuries had not been present when Mr. Howard had previously been examined shortly after being taken into police custody days earlier.

### The Coerced Confession

39. At approximately 4:00 a.m. on the date Mr. Howard finally capitulated to the repeated rounds of torture, the Defendants took Mr. Howard to the scene of the Ridgell murder and showed him how the crime had occurred.

40. One of the officers kept saying "he's not going to do it," or words to that effect, suggesting the belief that Mr. Howard might refuse to confess to the murder when the time came for his court reported statement.

41. At that point, the Defendants uncuffed Mr. Howard and instructed him to run. Due to his belief that the police would shoot him if he obeyed the command, Mr. Howard refused to run.

42. On the way back to the station, one of the officers hit Mr. Howard in the stomach again and reminded him that he "had better sign," or words to that effect.

43. After returning to Area 2 Headquarters sometime around 5:00 a.m. on November 3, the police returned Mr. Howard to the same interrogation room where he had been beaten and tortured. Mr. Howard remained in the room until Assistant State's Attorney ("ASA") Denise O'Malley (now an Illinois appellate court judge) arrived to take his statement.

8

44. Fearing for his life, Mr. Howard followed Defendants' instructions and "confessed" to a crime he did not commit. Mr. Howard would not have confessed falsely to the Ridgell murder but for Defendants' torture and threats.

45. The seven-page confession which Defendants coerced Mr. Howard to sign was contradicted by the physical evidence. To cite just one example, Mr. Howard "confessed" that he was standing a car length or two from the victim when he supposedly fired the shot, whereas subsequent forensic testing established that the killer was at most six inches from the window when he pulled the trigger.

### Witness Manipulation

46. Had he been available to the defense at Mr. Howard's murder trial, Byron Hopkins would have provided material exculpatory information which would have changed the result at trial, including:

a. He would have corroborated the beating to which Mr. Howard was subjected by confirming that he observed Mr. Howard emerge from the interrogation room with injuries consistent with having been punched or slapped in the face;

b. He would have corroborated that he too was kicked by the police while in custody in a manner similar to that alleged by Mr. Howard;

c. He would have demonstrated the falsity of the coerced confession by clarifying that he never supplied any gun to Mr. Howard, as was suggested in the false confession; and

9

    d.    He would have revealed how the Chicago Police continually harassed and threatened him, both before and after his release from custody, all in an effort to try to persuade him to help railroad Mr. Howard. This included repeated stops and searches of Mr. Hopkins on the street, a threat to charge Mr. Hopkins with murder, putting a gun to his eye, and punching him. During one of the stops, the officer told Mr. Hopkins that if Mr. Hopkins would cooperate in corroborating that he gave Mr. Howard the murder weapon, "they could give Stanley the chair."

    47.    One or more of the Defendants improperly exerted influence on Mr. Hopkins in a (successful) effort to persuade him to refrain from providing all of this exculpatory information to Mr. Howard's defense. In addition to the threats described above, an unknown individual (who may or may not be a member of the Chicago Police Department) approached Mr. Hopkins and stated that if Mr. Hopkins cooperated with the attempt to convict Mr. Howard, then Mr. Hopkins would be left alone and his record wiped clean. This individual also told Mr. Hopkins that he should be thinking about his security and well-being.

    48.    As a result of the foregoing improper witness manipulation, Mr. Hopkins fled the State of Illinois without revealing to Mr. Howard's defense the exculpatory information in his possession.

    49.    In a manner to be more fully discovered in this civil litigation, Defendants also manipulated and otherwise tainted other witness testimony in order to frame Mr. Howard for a murder he did not commit.

50. In particular, the adverse eyewitness testimony of Ms. Mullen was both (a) so different from her original story, and (b) so thoroughly at odds with the physical reality of what happened that night, that said testimony could only have been the product of improper suggestiveness/manipulation on the part of one or more Defendant, or others working in concert with them.

### Mr. Howard's Trial and Conviction

51. In 1987, Mr. Howard was tried before Circuit Court Judge John J. Mannion, himself a former Area 2 police officer who had worked with some of the Defendants in this action. In fact, Judge Mannion subsequently testified on behalf of Jon Burge in 1992 as a character witness in connection with the Police Board's termination proceedings. While a police officer, Judge Mannion had also served on a Task Force with one of the two police officers who Mr. Howard was accused of robbing, a relationship never disclosed to Mr. Howard at the time of trial.

52. In a 1999 interview with the press, Judge Mannion made known his feelings about the torture allegations: "Are you going to believe Stanley over three police officers?"

53. On the basis of the coerced confession, which was admitted into evidence at trial, Mr. Howard was convicted of the Ridgell murder. On April 15, 1987, he was sentenced to death.

54. There was no physical evidence -- *i.e.*, no gun or fingerprints -- linking Mr. Howard to the murder. In fact, absent Defendants' malfeasance in terms of manipulating/tainting witness testimony, making false reports, and otherwise

fabricating evidence to frame Mr. Howard, there would have been no evidence at all to tie him to this crime.

55. As such, but for Defendants' misconduct, Mr. Howard would neither have been prosecuted nor convicted.

### Chicago's Policy and Practice

56. Mr. Howard was the victim of, and all of his injuries were proximately caused by, a policy and practice on the part of the City of Chicago.

57. Specifically, throughout the 1980s, a group of Chicago Police Officers in Area 2 under the command of Defendant Jon Burge engaged in systematic torture and abuse in attempting to extract confessions from suspects to "solve" crimes more expediently and to enhance their personal standing in the Department. This reality was known to the command personnel, who themselves participated in the torture.

58. When Burge was subsequently transferred to Area 3, the torture shifted to Area 3.

59. The systematic torture in which certain Area 2 & 3 personnel were engaged included electric shocks administered to the testicles and other parts of the body from a small black box, electric shocks with what is now believed to be a cattle prod, suffocation to the point of unconsciousness with plastic bags and a typewriter cover, Russian roulette, burnings, severe beatings, and threats of death.

60. All told, there are up to ninety known victims of this torture, though there may well be others. At least thirteen of these individuals ended up on Death Row with Mr. Howard.

12

61. The pattern of utilizing torture to coerce confessions was investigated and confirmed by official findings of internationally-recognized experts in torture and abuse, investigative agencies, administrative tribunals, and state and federal court judges and juries, as well as the Chicago Police Department's own Office of Professional Standards.

62. The following examples of torture occurred in Area 2 under Commander Burge's watch which are corroborated by sworn testimony:

a. Andrew Wilson was beaten, tortured, burned, suffocated/bagged and electrocuted by Officers Burge, Hill, McKenna and O'Hara while in police custody on February 10, 1982. Burge also put a gun in his mouth. Mr. Wilson gave sworn in-court testimony on November 12, 1982 describing this torture.

b. Alonzo Smith was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne and Dignan while in police custody on January 23, 1983. Mr. Smith gave sworn in-court testimony on August 3, 1983 describing this torture.

c. Jerry Mahaffey was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne, Boffo, Grunhard and Yacaitis while in police custody on September 2, 1983. Mr. Mahaffey gave sworn in-court testimony on February 13, 1984 describing this torture.

d. Reginald Mahaffey was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne, Boffo, Grunhard and Yacaitis while in police custody on September 2, 1983. Mr.

13

Mahaffey gave sworn in-court testimony on February 10, 1984 describing this torture.

e.    David Bates was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne, Dignan, Dwyer, and Grunhard while in police custody on October 29, 1983.  Mr. Bates gave sworn in-court testimony on June 13, 1985 describing this torture.

f.    Gregory Banks was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne, Dignan, Dwyer, and Grunhard while in police custody on October 29, 1983.  Mr. Banks gave sworn in-court testimony on June 13, 1985 describing this torture.

g.    Darrell Cannon was beaten, tortured, and electrocuted by Officers Byrne, Dignan, and Grunhard while in police custody on November 23, 1983.  Mr. Cannon gave sworn in-court testimony on March 27, 1984 describing this torture.

h.    Leonard Hinton was beaten, tortured, coerced, electrocuted, and suffocated/bagged by Officers Burge and Byrne while in police custody on November 25, 1983.  Mr. Hinton gave sworn in-court testimony on July 1, 1985 describing this torture.

i.    Steven Bell was beaten, tortured, coerced, and suffocated/bagged by Officers Byrne, Boffo, Dignan, Hines, Patton, and Yucaitis while in police custody on July 21, 1986.  Mr. Bell gave sworn in-court testimony on November 20, 1986 describing this torture.

j.    Michael Tillman was beaten, tortured, coerced, and suffocated/bagged by Officers Boffo, Dignan, Hines,

14

and Yucaitis while in police custody on July 21, 1986. Mr. Tillman gave sworn in-court testimony on November 21, 1986 describing this torture.

k.    Madison Hobley was beaten, tortured, suffocated/bagged, and choked by Officers Lotito and Dwyer while in police custody on January 6, 1987. Mr. Hobley provided sworn testimony describing this torture on several occasions.

l.    Lavert Jones was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne while in police custody on January 28, 1984. Mr. Jones gave sworn in-court testimony on March 5, 1987 describing this torture.

m.    Derrick King was beaten, tortured, and coerced by Officers Burge, Byrne, Dwyer, and Basile while in police custody on February 23, 1980. Mr. King gave sworn in-court testimony on November 20, 1980 describing this torture.

n.    Philip Adkins was beaten and tortured by Officers Boffo, Lotito, and others while in police custody so badly that he defecated in his pants. Mr. Adkins gave sworn in-court testimony on June 7, 1984 describing this torture.

o.    Walter Johnson was beaten, tortured, coerced, and suffocated/bagged by Officer Glynn while in police custody. Mr. Johnson gave sworn in-court testimony on February 10, 1982 describing this torture.

p.    Roy Wade Brown was beaten, tortured, coerced, and suffocated/bagged by Officer Burge and others while in police custody. Mr. Brown gave sworn in-court testimony on February 9, 1982 describing this torture.

q.     Donald White was beaten, tortured, coerced, and suffocated/bagged by Officers Burge, Hill, O'Hara, and Yucaitis while in police custody on February 12, 1982.  Mr. White gave sworn in-court testimony describing this torture.

r.     Melvin Jones was beaten, tortured, electrocuted, coerced, and suffocated/bagged by Officers Burge, McWeeny, and other Area 2 police officers while in police custody on February 5, 1982.  Mr. Jones gave sworn in-court testimony on August 5, 1982 describing this torture.

s.     Sylvester Green was beaten, tortured, and suffocated/bagged by Officers Burge, Basile, McNally, and Paladino while in police custody.  Mr. Green gave sworn in-court testimony on March 4, 1983 and December 28, 1983 describing this torture.

t.     Shadeed Mu'min was beaten, tortured, coerced, and suffocated/bagged by Officers Burge and Paladino while in police custody on October 30, 1985.  Mr. Mu'min gave sworn in-court testimony describing this torture.

u.     Aaron Patterson was beaten, tortured, coerced, and suffocated/bagged by Officers Burge, McWeeny, Madigan, Pederson, Pienta and Marley while in police custody on April 30, 1986.  Mr. Patterson gave sworn in-court testimony describing this torture on several occasions.

v.     Andrew Maxwell beaten, tortured, coerced, and suffocated/bagged by Officer Glynn and other Area 2 police officers while in police custody on November 4, 1986.  Mr. Maxwell gave sworn in-court testimony describing this torture.

16

w.     Michael Coleman was beaten, tortured, and coerced by Officer Dwyer while in police custody on February 23, 1980.  Mr. Coleman gave sworn in-court testimony on November 20, 1980 describing this torture.

x.     Michael Johnson was beaten, tortured, shocked, and coerced by Officer Burge while in police custody. Mr. Johnson gave sworn testimony on June 6, 1982 describing this torture.

y.     Eric Caine was beaten, tortured, and coerced by Officers McWeeny, Madigan, Marley, Pederson and Pienta while in police custody.  Mr. Caine gave sworn in-court testimony on April 30, 1986 describing this torture.

z.     Gregory Howard was beaten, tortured, and coerced by Officers Basile and Glynn while in police custody. Mr. Howard gave sworn in-court testimony on November 12, 1986 describing this torture.

63.     In addition to the above-listed torture victims, the following individuals were also tortured by Area 2 police officers:

a.     Dwight Anthony
b.     Madison Brown
c.     Ronnie Bullock
d.     Howard Collins
e.     Andre Coulter
f.     James Daniel
g.     Raymond Golden
h.     Anthony Hall
i.     Mozy Harris
j.     Roger Harris
k.     Terry Harris
l.     Anthony Holmes
m.     Lee Holmes
n.     Ronald Jackson
o.     Nora Jordan

p.  Leonard Kidd
q.  James Lewis
r.  Thomas Liss
s.  Derrick Martin
t.  Paul Mike
u.  Larry Milan
v.  Doris Miller
w.  Solomon Morgan
x.  Ronald Nash
y.  Lawrence Orange
z.  William Phillips
aa. Alfonso Pinex
ab. Willie Porch
ac. Lawrence Poree
ad. George Powell
ae. Alvin Smith
af. Willie Stokes
ag. Perlie Sutckey
ah. Timothy Thompson
ai. Tony Thompson
aj. Donnell Traylor
ak. Leontine Wilbon
al. Jackie Wilson
am. Jesse Winston
an. Cortez Brown
ao. James Cody
ap. James Andrews

64.  Chicago's Office of Professional Standards ("O.P.S.") eventually concluded that of the torture victims listed in the preceding Paragraph alone, more than half were subjected to police beatings, thirteen involved suffocation by bagging, eleven involved threats and/or striking with a firearm, nine involved electric shock abuse, and two involved hangings.

65.  Although electrocution and suffocation were the preferred methods of torture because neither leaves physical marks, at least five of these torture cases resulted in what O.P.S. characterized as "serious injuries".

66.  Defendants Byrne and Burge were involved in many of these cases, as were other police officers from Area 2,

including Defendants Lotito, Boffo, Paladino, Dwyer, Glynn, and McWeeny. According to Chicago's O.P.S. statistics, Burge was named as an accused in 51% of the cases where the accused officers could be identified. Burge was also an accused in eight of the nine cases were electrocution was alleged.

67. With only one exception, all of the foregoing torture victims (98%) were African American.

68. All of the accused police officers were white.

69. What is striking about the accusations is the repetitiveness in terms of the details regarding the *modus operandi* of the torturers.

70. In many of the cases which resulted in coerced confessions, including Mr. Howard's, there was no other physical evidence (such as fingerprints or a weapon) liking the confessor to the crime.

71. The Illinois Supreme and Appellate Courts and the United States District Court have reversed convictions and/or ordered new hearings and trials on the basis of evidence of confessions coerced by torture in, for instance, the following cases: <u>People v. Wilson</u>, 116 Ill. 2d 29 (1987); <u>People v. Banks</u>, 192 Ill. App. 3d 986 (1989); <u>People v. Cannon</u>, 293 Ill. App. 3d 694 (1997); <u>People v. Patterson</u>, 192 Ill. 2d 93 (2000); <u>People v. Bates</u>, 267 Ill. App. 3d 503 (1994); <u>People v. King</u>, 192 Ill. 2d 189 (2000); <u>United States *ex. rel.* Maxwell v. Gilmore</u>, 1999 WL 130331 (N.D.Ill. 1999).

72. At least a dozen of these instances of torture resulted in civil lawsuits. In 1989, for example, in the case of

Andrew Wilson v. City of Chicago, a federal jury concluded that "the City of Chicago had a *de facto* policy, practice or custom whereby Chicago police officers were allowed to physically abuse persons suspected of injuring or killing another Chicago police officer." On appeal of the Wilson case, Chicago itself characterized Burge's actions as "sadistic torture."

73. As a Northern District of Illinois Judge observed in a written opinion ten years after Wilson: "It is now [by 1999] common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis."

74. Because convictions were improperly secured by means of Area 2 police torture under Commander Burge, four of the individuals listed in the foregoing paragraphs (Plaintiff, Aaron Patterson, Madison Hobley, and Leroy Orange) were all recently pardoned by then-Governor Ryan on the grounds of innocence. Still more victims of Area 2 police torture had their death sentences commuted by Governor Ryan earlier this year in an attempt to reverse the injustice.

75. Former Police Superintendent Richard Brzeczek, who was Superintendent when many of the torture allegations arose, recently told the *Chicago Tribune* that there is now "no doubt in [his] mind that Burge and his men tortured some suspects."

20

## Chicago's "Blind Eye"

76. The coercive interrogations described in the preceding paragraphs were allowed to take place because the City declined to implement any mechanism for oversight or punishment.

77. In particular, the Department's system for disciplining police officers accused of using violence is basically nonexistent. During the time period at issue, the agency charged with investigating these allegations (O.P.S.) rejected approximately 95% of all citizen complaints of violence, and the very few which were "sustained" were usually overturned on review such that no discipline was ever imposed. The pattern described in this Paragraph continues unchanged to this day.

78. In 1987, then-Chief Administrator of O.P.S. David Fogel wrote a memo admitting that O.P.S. was a farce.

79. Specifically, the Fogel Memo admits that "the troops love O.P.S. . . . [It] actually operates to immunize police from internal discipline. . . . and has institutionalized lying." Fogel's Memo explained that a substantial proportion of O.P.S.' investigators were thoroughly incompetent, part of a "politically corrupt heritage of pre-[Mayor Harold] Washington days."

80. Fogel's Memo concludes in part that: "O.P.S. gives the appearance of formal justice, but actually helps to institutionalize subterfuge and injustice."

81. With respect to the allegations of police torture in Area 2, the O.P.S. initially found that each and every one of the allegations was groundless. Thus, at the time the allegations were first made, no Chicago police officer was deemed

culpable, much less disciplined, for any of these instances of coercive/torturous interrogations.

82. In addition to failing to discipline the offending officers internally, the Department also referred none of these allegations of police torture to the State's Attorney's Office for possible prosecution of the officers. This institutional unwillingness to refer accusations of police brutality for prosecution was true throughout the relevant time period, and it continues through to the present.

83. In this way, Chicago police officers who beat or tortured criminal suspects during interrogation had every reason to know that they enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, thereby encouraging the very type of abuse at issue in this case.

### Suppression of Exculpatory Information Regarding these Torture Allegations

84. In September 1990, an O.P.S. investigator named Goldston concluded a study of more than fifty allegations of police torture in Area 2 through the mid-1980s; this investigation was based on review of cases one by one, and the data was compiled into a 160-page statistical analysis.

85. The resulting Goldston Report dated September 28, 1990 (which was after Mr. Howard was convicted but before his appeal was resolved) concluded that a "preponderance" of evidence dictated the conclusion that "systematic" and "methodical" abuse occurred over a ten year period, abuse which was "not limited to

22

the usual beating, but went into such esoteric areas as psychological techniques and *planned torture.*" (emphasis added).

86. The Report also concluded that certain unnamed "[p]articular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

87. With respect to Mr. Howard's case, the Goldston Report constituted material exculpatory evidence which could have corroborated Mr. Howard's account of his coerced confession. Because it documents dozens of similar examples of very similar torture methodology, Mr. Howard could have used the evidence contained in the Report as part of his defense.

88. This exculpatory evidence is particularly compelling because although the allegations of torture come from disparate individuals with no connection to one another and no knowledge of each other's complaints, the allegations nonetheless exhibit uncanny similarity in terms of details such as, for instance, the seemingly improbable practice of suffocation by "bagging" experienced by Mr. Howard.

89. Instead of disclosing the new exculpatory evidence to Mr. Howard's defense, Defendants Martin and Shines suppressed the Goldston Report. In fact, for fifteen months, Martin and Shines kept the Report a secret and showed it to no one.

90. Then-Superintendent Martin was motivated to suppress the Goldston Report at least in part because he himself had headed Area 2 during some of the relevant time period, in which capacity he was Burge's direct supervisor.

23

91. During the fifteen months that Martin and Shines were suppressing the Goldston report, they also took no action at all regarding any of the allegations. Despite the evidence and conclusion that police torture during interrogations had been "methodical" and "systematic," no move was made to discipline any police officer, and the Report's contents were instead completely swept under the rug.

92. In 1992, district court Judge Milton I. Shadur unsealed (over Chicago's objections) the secret Goldston Report by court order, precipitating public disgrace and embarrassment for the Department.

### Still More Suppression of Exculpatory Materials

93. Less than half of the 50 examples of torture cited in the Goldston Report had been investigated contemporaneously by O.P.S. Overall, only one of the 50 cases had resulted in a finding adverse to an accused police officer. Thus, with only one exception, the Department either conducted no investigation or cleared the accused in every one of these 50 torture cases.

94. In 1992, with public attention focused on suppressed accusations of police torture after the Goldston Report came to light (as well as the initiation of proceedings to terminate Burge that same year), then-Superintendent Brzeczek publicly promised an investigation into allegations of police torture in Area 2.

95. To that end, nine of the allegations of torture, including Mr. Howard's case, were re-opened by O.P.S.

96. In most of these re-opened cases, including Mr. Howard's, the subsequent re-investigation reversed the original exonerations and "sustained" the findings of wrongdoing on the part of the accused officers.

97. In particular, in the course of re-investigating Mr. Howard's allegations, O.P.S. uncovered new corroborating information and ultimately credited Mr. Howard's version over that of the Defendant Officers. Describing the accounts of the police officers and prosecutors as "fraught with contradictions and discrepancies which damage their credibility," the O.P.S. investigator "sustained" charges against Defendants Byrne, Boffo, and Lotito after the eight-month re-investigation.

98. In spite of these new conclusions that certain police officers in Mr. Howard's case and others were guilty of torturing suspects during interrogations, the Department took no disciplinary action against any officer (many of whom were still on the force) except Burge.

99. Instead, approximately five years after the re-investigations found the torture allegations credible and recommended discipline in Mr. Howard's case and others, Defendant Hillard and his general counsel, Defendant Needham, made a secret decision to shelve all of these new O.P.S. findings.

100. Specifically, in August 1998, Needham wrote a confidential Memo instructing O.P.S. to close all of the cases and to re-classify all of these newly "sustained" findings as "non-sustained," thereby clearing all of the officers.

25

101. Although Needham subsequently claimed he had never really read the files and Hillard claimed he never even saw them, the authority to summarily reverse the sustained finding in Mr. Howard's case (and others) and close these cases without further investigation is vested exclusively in Defendant Hillard. Under Chicago's policy, said action could only have been undertaken at Hillard's direction.

### Further Cover-Up/Withholding

102. From 1992 through 1999 the Department and the Defendants with authority over these matters kept a secret of the new "sustained" findings and the related evidence supporting the victims, including Mr. Howard. This secret might have remained buried forever had it not been exposed involuntarily per court order in the course of a civil case against Chicago in mid-1999.

103. In this way, for more than six years, Defendants Martin, Shines, Hillard, and Needham all suppressed exculpatory evidence from Mr. Howard and other victims who had been convicted based on coerced confessions. Instead of using this evidence to remedy the miscarriages of justice, the Defendants first buried the evidence, then summarily nullified it, and then tried to conceal that decision as well.

104. As a result of Defendants' actions, Mr. Howard and the other victims faced execution without the benefit of the knowledge/evidence that Chicago's investigators had subsequently corroborated their contentions that their confessions were coerced. The reason the victims never learned this information was because the Defendants improperly hid it from them.

105. In Mr. Howard's case, the new (re-investigation) "sustained" conclusion corroborating Mr. Howard's accusations, as well as the related O.P.S. documents containing additional new exculpatory information, were all withheld from Mr. Howard's criminal defense team for almost a decade as he continued to reside on Death Row litigating his post-conviction position in the Illinois courts.

106. Despite the ongoing post-conviction appeal, the law firm representing Chicago refused all requests by Mr. Howard's counsel to make these documents available to him until after Mr. Howard received his pardon in 2003.

107. Had the information been provided to Mr. Howard rather than suppressed, his post-conviction proceedings would have been resolved favorably to Mr. Howard.

**Aftermath**

108. Other than Burge, Chicago has never disciplined any police officer for any of the allegations of police torture, including those officers who were subsequently adjudicated culpable after the re-investigations. Nor were any of the involved officers ever referred to the State's Attorneys' Office for prosecution, and many remain on the force to this day unpunished in any manner.

109. Even after Needham's secret Memo (reversing all of the sustained findings and closing the cases summarily) surfaced in 1999, the City, through Hillard and his spokeswoman, made clear that the Department was now finished with these allegations, and that no officer would ever be punished in the

27

future.  In a deposition in 1999, Hillard stated under oath in his capacity as Chicago Police Superintendent that he "didn't know nothing" about the Goldston Report.

110. Burge is now retired in Florida, supported by approximately $30,000/year in pension by the City of Chicago.

### Mr. Howard's Damages

111. Dr. Antonio Martinez of the Kovler Center for the Treatment of Survivors of Torture, an expert in the testing of survivors of torture, performed a detailed psychological examination of Mr. Howard and concluded that to a reasonable degree of medical certainty, Mr. Howard experienced Post Traumatic Stress Disorder as a result of having been tortured.

112. In addition to these damages, Mr. Howard spent fifteen years on Death Row because he was framed by Defendants for a crime he did not commit.  In Governor Ryans' words: "The category of horrors was hard to believe.  If I hadn't reviewed the case[] myself, I wouldn't believe it.... [This is a] perfect example[] of what is so terribly broken about our system."

113. Before he received his pardon on the basis of innocence earlier this year, Mr. Howard suffered enormously.  He has spent virtually his entire adult life living alone in a tiny cold cell on Death Row under the tightest security imaginable and all of the indignities/inhumanity that entails, all under the specter of an unjust death sentence.

114. If not for Governor Ryan's efforts to correct this injustice, Mr. Howard might well have been electrocuted or poisoned by the State of Illinois by lethal injection for a crime

he had nothing to do with, all as a result of Defendants'
malfeasance in the manner described herein.

115. Mr. Howard's life has been ruined by the
Defendants. Before his arrest at age 21 in the manner described
above in this Complaint, Mr. Howard had no criminal record other
than a theft conviction for which he was sentenced to two days in
jail. Believing he had robbed two Chicago police officers, the
Defendants framed him for multiple serious crimes, including the
murder for which he was subsequently pardoned. As a result of
being railroaded in this manner, and then being deprived unjustly
of exculpatory materials, Mr. Howard has spent his entire adult
life in prison, the majority of it on Death Row. This treatment
is extraordinarily unjust, and must be remedied.

### Count I -- 42 U.S.C. § 1983

### Coerced Confession

116. Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

117. As more fully described above, Defendants Byrne,
Lotito and Boffo, individually, jointly, and in conspiracy, beat
Stanley Howard and placed a plastic typewriter cover over his
head, intentionally causing Plaintiff to suffocate while other
Defendant Officers looked on without intervening.

118. As a result of Defendants' unjustified and
excessive use of force, Mr. Howard suffered great mental anguish,
humiliation, degradation, physical and emotional pain and
suffering, and other consequential damages.

119. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

120. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in the manner described more fully above in that:

a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of constitutional violation at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

b. As a matter of both policy and practice, the Department facilitates the very type of constitutional violation at issue here by failing to adequately punish and discipline prior instances of misconduct, including "repeater" offenders who exhibit patterns of abuse, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff;

c. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Department violated the constitutional rights of citizens in a manner similar to that alleged by Plaintiff on a frequent basis, all with the knowledge and acquiescence of supervisory and command personnel, yet the Department makes findings of wrongdoing in a disproportionately small number of cases;

d.    Generally, as a matter of widespread practice
so prevalent as to comprise municipal policy, the Department
refuses to refer police officers for prosecution even when they
commit violent crimes such that said officers are encouraged to
believe they enjoy *de facto* immunity from criminal prosecution.

e.    Plaintiff's injuries were also caused by the
policies and practices on the part of the City of Chicago of
suppressing exculpatory <u>Brady</u> materials and improperly refusing
to create exculpatory <u>Brady</u> materials.

f.    Plaintiff's injuries were also caused by the
policies and practices of coercing confessions, failing to video
tape interrogations, and fabrication of evidence, including false
reports, all designed to encourage prosecutions and secure
convictions regardless of actual guilt or innocence.

g.    Municipal policy-makers and Department
supervisors are aware of (and condone and facilitate by their
inaction) a "code of silence" in the Chicago Police Department,
by which officers fail to report and otherwise lie about
misconduct committed by other officers, such as the misconduct at
issue in this case; and

h.    The City of Chicago failed to timely act to
remedy the patterns of abuse described in the preceding sub-
paragraphs, despite actual knowledge of the same, thereby
ratifying the unlawful practices and causing the types of
injuries described herein.

121. The constitutional injuries complained-of herein
were proximately caused by a pattern and practice of misconduct

which occurred with Defendants Burge and Martin's knowledge and
consent in their supervisory capacity, such that Burge and Martin
personally knew about, facilitated, approved, and condoned this
pattern and practice of misconduct, or else affirmatively turned
a blind eye thereto without taking any steps to stop it.

122. In this way, Defendants Burge and Martin are
personally responsible for the complained-of injuries because
they knowingly, willfully, or at least recklessly caused the
alleged deprivation by their action or by their deliberately
indifferent failure to act.

123. Independently, Defendant Burge is a supervisor who
failed to stop misfeasor officers under his direction who had
summarily tortured Plaintiff despite his knowledge of the same.

### Count II -- 42 U.S.C. § 1983

### Failure to Intervene

124. Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

125. In the manner described above, during the coercive
interrogation of Plaintiff some of the Defendants (and possibly
other Chicago Police Officers) stood by without intervening to
prevent the violence to which Plaintiff was subjected.

126. The Defendant Officers who had knowledge of the
coercive interrogation and therefore had a reasonable opportunity
to intervene included Defendants Dan McWeeny, John Paladino,
Robert Dwyer, Frank Glynn, and Jon Burge, all acting
independently, jointly, and in conspiracy.

32

127. As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

128. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

129. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described in preceding paragraphs.

### Count III -- 42 U.S.C. § 1983

### Due Process

130. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

131. As described more fully above, Defendants Byrne, Lotito, Boffo, McWeeny, Paladino, Dwyer, Glynn, Burge, Martin, Shines, Hillard, and Needham, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

132. In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading and misdirecting the state criminal prosecution of the Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

133. The misconduct of the Defendant Officers also resulted in the unjust criminal conviction of Plaintiff, thereby denying him his Constitutional right to a fair trial (and a fair appeal thereof) in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

134. As a result of the violation of his constitutional right to fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

135. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

136. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

137. Independently, the misconduct described in this Count is also attributable to Defendants Burge and Martin in their supervisory capacities as described more fully in Count I, and to Defendants Needham, Hillard, and Shines in the manner described more fully in the Counts alleging conspiracy.

### Count IV -- 42 U.S.C. § 1983

### False Imprisonment

138. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

139. As described more fully above, Defendants Byrne, Lotito, Boffo, McWeeny, Paladino, Dwyer, Glynn, Burge, Martin, Shines, Hillard, and Needham, all while acting individually, jointly, and in conspiracy, as well as under color of law and

within the scope of their employment, caused Plaintiff to be falsely imprisoned in violation of his Constitutional rights.

140. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

141. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

142. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

143. Independently, the misconduct described in this Count is also attributable to Defendants Burge and Martin in their supervisory capacities as described more fully in Count I, and to Defendants Needham, Hillard, and Shines in the manner described more fully in the Counts alleging conspiracy.

### Count V -- 42 U.S.C. § 1983

### Equal Protection

144. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

145. As described more fully above, Defendants Byrne, Lotito, Boffo, McWeeny, Paladino, Dwyer, Glynn, Burge, Martin, Shines, Hillard, and Needham, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his Constitutional rights.

146. Specifically, these Defendants actively participated in or personally caused misconduct in terms of

torturing minority criminal suspects in a manner calculated to coerce confessions. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

147. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

148. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

149. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

150. Independently, the misconduct described in this Count is also attributable to Defendants Burge and Martin in their supervisory capacities as described more fully in Count I, and to Defendants Needham, Hillard, and Shines in the manner described more fully in the Counts alleging conspiracy.

## Count VI -- 42 U.S.C. § 1983

### Right to Counsel

151. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

152. As described more fully above, Defendants Byrne, Lotito, Boffo, McWeeny, Paladino, Dwyer, Glynn, Burge, Martin, Shines, Hillard, and Needham, all while acting individually, jointly, and in conspiracy, as well as under color of law and

36

within the scope of their employment, denied Plaintiff his right to counsel in violation of his Constitutional rights.

153. This violation caused the confession on which his conviction was predicated, and this allegation therefore necessarily implies the invalidity of that conviction.

154. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

156. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

157. Independently, the misconduct described in this Count is also attributable to Defendants Burge and Martin in their supervisory capacities as described more fully in Count I, and to Defendants Needham, Hillard, and Shines in the manner described more fully in the Counts alleging conspiracy.

### COUNT VII -- Section 1983

### Conspiracy to Deprive Constitutional Rights

158. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

159. Prior to date of the constitutional injuries suffered by Plaintiff in this case, it was agreed among the police officer Defendants, on the one hand, and the individuals who comprise the Office of Professional Standards on the other hand, that if any members of the Chicago Police Department were

37

subsequently accused by citizens of wrongdoing, then the O.P.S. employees would actively endeavor to deem those citizen complaints unfounded or unsustained, even where police officers in fact violated citizens' rights.

160. The Agreement referenced in the preceding paragraph is the policy and practice of the Chicago Police Department, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

161. As a direct and proximate result of the illicit prior Agreement referenced above, Plaintiff's rights were violated.

162. Specifically, Plaintiff was convicted based on a coerced confession as a direct result of the Agreement with O.P.S. employees to decline to sustain citizen complaints even where meritorious. Because of this Agreement, the Defendant Officers were encouraged to believe they could act with a sense of impunity and without fear of any repercussions, even where they purposefully violated the rights of the citizens they were supposed to protect. In this manner, the alleged Agreement proximately caused Plaintiff's injuries in this case.

163. Independently, after the murder at issue in Plaintiff's case, the Defendant Officers further conspired, and continue to conspire, to frame Plaintiff for this murder and to thereby deprive Plaintiff of his constitutional rights as described in the various Paragraphs of this Complaint.

164. Independently, before and after Plaintiff's conviction, each of the Defendants further conspired, and

38

continue to conspire, to deprive Plaintiff of exculpatory
materials to which he was lawfully entitled and which would [
led to his exonerated of the false charges as described in tl
various Paragraphs of this Complaint.

165. In this manner, the Defendant Officers, acting
concert with other unknown co-conspirators, including person
are not members of the Chicago Police Department, have consp:
by concerted action to accomplish an unlawful purpose by an
unlawful means.

166. In furtherance of the conspiracy, each of the
co-conspirators committed overt acts and was an otherwise wi:
participant in joint activity.

167. The misconduct described in this Count was
undertaken with malice, willfulness, and reckless indifference
the rights of others.

168. As a proximate result of the conspiracy, Plai
suffered financial damage, as well as severe emotional distre
and anguish.

169. This conspiracy was undertaken for the additic
purpose of punishing Plaintiff for exercising his First Amenc
right to speak out about matters of public concern, namely, t
police abuses described above.

170. The misconduct described in this Count was
undertaken pursuant to the policy and practice of the Chicagc
Police Department in the manner described more fully in prece
paragraphs.

### COUNT VIII -- Section 1985(3) Conspiracy

### Conspiracy to Deprive Constitutional Rights

171. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

172. As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

173. In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

174. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

175. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

### COUNT IX -- Section 1983

### Denial of Access to Courts

176. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

177. In the manner described more fully herein, each of the Defendants, all while acting individually, jointly, and in conspiracy, denied Plaintiff the right to access to courts by their wrongful suppression of information and evidence which deprived Plaintiff of certain constitutional claims against certain potential defendants.

40

178. Other claims were diminished by the passage of years and the accompanying erosion of evidence necessary to prove them.

179. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

180. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

### COUNT X -- Section 1983

### Monell Claim Against Cook County & The Cook County SAO

181. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

182. Beginning as early as the Wilson case in the early 1980s, Cook County, through its State's Attorneys' Office, was expressly on notice that Burge and some of the officers under his command in Area 2 were torturing suspects during interrogations.

183. Throughout this time period, individual members of the State's Attorneys' Office had knowledge of the ongoing torture and abuse being used by Area 2 officers to extract coerced confessions.

184. Specifically, those Assistant State's Attorneys assigned to Felony Review who were brought in by Chicago Police Officers to take statements from suspects who were ready to "confess" were all too often confronted with accusations of abuse/torture. Every last one of these State's Attorney

41

representatives who came into contact with the problem affirmatively chose to turn a blind eye such that the abuse was permitted to continue unfettered.

185. The pattern of ignoring and thereby facilitating the abuse was so prevalent and widespread that it constituted the *de facto* policy and practice of the State's Attorneys' Office. Policymaking officials in the Cook County State's Attorneys' Office knew about it or should have, yet took no steps to remedy it such that the failure to do so was deliberately indifferent.

186. The lack of interest on the part of the State's Attorney's Office dates all the way back to the early 1980s. After Mr. Wilson's torture allegations drew public attention, then Superintendent Brzeczek sent a letter to then-State's Attorney Richard Daley asking for advice on how to proceed in investigating the torture allegations without jeopardizing the Wilson prosecution. Daley never responded to this letter.

187. The acquiescence of the State's Attorney's Office continues through the present. Specifically, while current Cook County State's Attorney Richard Devine was in private practice, beginning in 1988 and continuing for at least eight years, Devine's law firm represented Burge, Byrne and other Area 2 officers who had engaged in torture.

188. All told, the City of Chicago and the Fraternal Order of Police paid Devine's firm more than one million dollars to defend Burge and the others in defending against civil suits and administrative proceedings involving torture allegations over an eight year period.

189. Upon becoming the Cook County State's Attorney, Devine has continued to shield Burge and his cohorts from prosecution notwithstanding the crimes they committed against Mr. Howard and the others. None of the police officers engaged in this torture and abuse have ever been prosecuted.

## COUNT XI -- State Law Claim
## Malicious Prosecution

190. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

191. Plaintiff was improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of innocence.

192. The Defendant Officers identified above accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

193. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that the statements were false and perjured. In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

194. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

43

195. As a result of this misconduct, Plaintiff has suffered and continues to suffer injuries including pain and suffering.

## COUNT XII -- State Law Claim
### Civil Conspiracy

196. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

197. As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

198. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

199. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

200. As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish.

## COUNT XIII -- State Law Claim
### Intentional Infliction of Emotional Distress

201. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

202. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants Officers intended to cause, or were in reckless disregard of the

44

probability that their conduct would cause, severe emotional
distress to Plaintiff.

203. Said actions and conduct did directly and
proximately cause severe emotional distress to Plaintiff and
thereby constituted intentional infliction of emotional distress.

204. The misconduct described in this Count was
undertaken with malice, willfulness, and reckless indifference to
the rights of others.

205. As a proximate result of Defendants' wrongful
acts, Plaintiff suffered damages, including severe emotional
distress and anguish.

## COUNT XIV - State Law Claim
## Respondeat Superior

206. Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

207. In committing the acts alleged in the preceding
paragraphs, each of the Defendant Officers were members of, and
agents of, the Chicago Police Department acting at all relevant
times within the scope of employment and under color of law.

208. Defendant City of Chicago is liable as principal
for all torts committed by its agents.

## COUNT XV - State Law Claim
## Indemnification

209. Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

210. Illinois law provides that public entities are
directed to pay any tort judgment for compensatory damages for

which employees are liable within the scope of their employment activities.

211. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, STANLEY HOWARD, respectfully requests that this Court enter judgment in his favor and against Defendants, BYRNE, LOTITO, BOFFO, MCWEENY, PALADINO, DWYER, GLYNN, BURGE, MARTIN, SHINES, HILLARD, NEEDHAM, CITY OF CHICAGO, COOK COUNTY, and the COOK COUNTY STATE'S ATTORNEYS' OFFICE, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, STANLEY HOWARD, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED:



Arthur Loevy
Jon Loevy
Michael Kanovitz
Kurt Feuer
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

47

**UNITED STATES DISTRICT COURT**    JUDGE ANDERSEN
**NORTHERN DISTRICT OF ILLINOIS**   MAGISTRATE SIDNEY I. SCHENKIER

## Civil Cover Sheet 03C 8481

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

**Plaintiff(s): Stanley Howard**

**Defendant(s):City of Chicago, Present and Former Chicago Police Officers John Byrne, James Lotito, Ronald Boffo, Daniel McWeeny, John Paladino, Robert Dwyer, Frank Glynn, Jon Burge, Leroy Martin, Terry Hillard, and other Unknown Chicago Police Officers, as well as Thomas Needham, Gayle Shines, County of Cook and the Cook County State's Attorneys' Office**

County of Residence: Cook

County of Residence:

Plaintiff's Atty:    Loevy & Loevy
312 N. May St., Suite 100
Chicago, IL 60607
(312) 243-5900

Defendant's Atty:

DOCKETED

NOV 2 5 2003

**II. Basis of Jurisdiction:**     **3. Federal Question (U.S. not a party)**

**III. Citizenship of Principal Parties**
**(Diversity Cases Only)**
Plaintiff: - N/A
Defendant: - N/A

**IV. Origin :**     **1. Original Proceeding**

**V. Nature of Suit:**     **440 Other Civil Rights**

**VI. Cause of Action:**     **42 U.S.C. Section 1983**

**VII. Requested in Complaint**
Class Action:
Dollar Demand:
Jury Demand: **Yes**

**VIII.** This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:   11/24/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**   Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUDGE ANDERSEN

MAGISTRATE SIDNEY I. SCHENKI

In the Matter of

Stanley Howard

v.

City of Chicago, Present and Former Chicago Police Officers John Byrne, James Lotito, Ronald Boffo, Daniel McWeeny, John Paladino, Robert Dwyer, Frank Glynn, Jon Burge, Leroy Martin, Terry Hillard, and other Unknown Chicago Police Officers, as well as Thomas Needham, Gayle Shines, County of Cook and The Cook County State's Attorneys' Office

Case Number:

# 03C 8481

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff, Stanley Howard

DOCKETED
NOV 2 5 2003

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Jon Loevy | | | | NAME Arthur Loevy | | | |
| FIRM Loevy & Loevy | | | | FIRM Same | | | |
| STREET ADDRESS 312 N. May St., Suite 100 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP Chicago, IL 60607 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER (312) 243-5900 | | FAX NUMBER (312) 243-5902 | | TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | | E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 02618254 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 1682479 | | | |
| MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☑ | |
| | | | | DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ | |

| (C) | | | | (D) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Mike Kanovitz | | | | NAME Kurt Feuer | | | |
| FIRM Same | | | | FIRM Same | | | |
| STREET ADDRESS | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | FAX NUMBER | | TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | | E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6275233 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6187322 | | | |
| MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☑ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ | | DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ | |