# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 3 C 8481 | **DATE** | 10/22/2004 |
| **CASE TITLE** | Stanley Howard vs. City of Chicago et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: Defendant's motion to dismiss [22-1] is granted in part and denied in part. Plaintiff Howard is given until 11/17/2004 to file an amended complaint. Defendants are given until 12/17/2004 to file their answers to the amended complaint.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | OCT 2 5 200 | Document Number |
| ✓ | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | | 63 |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | courtroom deputy's initials | date mailed notice |
| TSA | | Date/time received in central Clerk's Office | mailing deputy initials |

U.S. DISTRICT COURT
CLERK
94:8 HV 52 100 h002
2004 OCT 25 AM 8:46

STANLEY HOWARD,  )
         )
 Plaintiff,   )
         )
 v.       ) No. 03 C 8481
         )
CITY OF CHICAGO, Present and Former ) Wayne R. Andersen
Chicago Police Officers, JOHN BYRNE, JAMES ) District Judge
LOTITO, RONALD BOFFO, DANIEL )
McWEENY, JOHN PALADINO, ROBERT )
DWYER, FRANK GLYNN, JON BURGE, )
LEROY MARTIN, TERRY HILLARD, and )
other UNKNOWN CHICAGO POLICE )
OFFICERS, as well as FORMER COUNSEL TO )
THE SUPERINTENDENT, THOMAS )
NEEDHAM, and GAYLE SHINES, Former OPS )
Director,      )
         )
 Defendants.   )

DOCKETED

OCT 2 5 2004

## MEMORANDUM, OPINION AND ORDER

Plaintiff Stanley Howard filed this fifteen-count complaint alleging various federal and state law claims against the City of Chicago, eight current and former members of the Chicago Police Department, two former Superintendents of the Chicago Police Department, a former general counsel to the Superintendent of Police, and a former Chief Administrator of the Chicago Police Department's Office of Professional Standards (collectively, "Defendants"). Currently before the court is the Defendants' motion to dismiss Plaintiff's complaint. For the following reasons, the motion is granted in part and denied in part.

### BACKGROUND

In the early morning hours of May 20, 1984, Olive Ridgell was murdered as he sat in a parked car with his lover, Tecora Mullen. Both the deceased and Ms. Mullen were married, but

not to each other. In fact, the car in which they were seated when Mr. Ridgell was shot was parked just around the corner from where Ms. Mullen lived with her husband.

A witness who lived near the shooting heard Ms. Mullen plead: "don't hurt him," then "don't hurt him, just take me home," followed by the fatal shot. Another witness who lived nearby also heard a man's voice state: "I told you I'd catch you motherfuckers," followed by a single gunshot.

Approximately six months after the Ridgell shooting, at approximately 6:00 p.m. on November 1, 1984, Howard was arrested on an unrelated warrant for a crime that had occurred some fourteen months prior. Howard was twenty-one years old at the time and had no criminal record other than a theft conviction for which he was sentenced to two days in jail.

Howard alleges that, after his arrest, he was placed in an interrogation room where an officer informed him that he had been implicated in an armed robbery of two Chicago Police Officers. Howard then informed one of the two police officers who had brought him into the interrogation room that he wanted an attorney, and he wanted to make a telephone call. These requests allegedly were ignored. At some point thereafter, Defendant McWeeny entered the interrogation room and told Howard that he had been looking for him because Howard had supposedly "messed over [McWeeny's] friends." McWeeny proceeded to interrogate Howard about the armed robbery involving the two Chicago Police Officers, telling Howard that if he did not return the badges and pistols which McWeeny believed Howard had taken, then Howard would be "in more trouble than you can handle."

Howard denied committing the robbery of the two Chicago Police Officers, and he refused to make or sign any incriminating statements. As he was being taken back to the lock-

2

up, another police officer informed Howard that "before you leave, you will tell us what we need to know."

At some point during the post-midnight hours on November 3, 1984, Defendants Lotito and Boffo took Howard from the lock-up to an interrogation room, where they allegedly handcuffed his hands to a ring on the wall. These two officers, along with Defendant Byrne, told Howard that they wanted to talk to him about the Ridgell murder. They started the interrogation by explaining to Howard how the murder had occurred and asked Howard whether he wanted to confess to it.

When Howard responded that he had nothing to confess, the Defendants allegedly began to beat him. Specifically, Howard alleges that they proceeded to slap, punch, and kick him on his leg and midsection. Defendant Lotito allegedly held a plastic shopping bag over Howard's head, and then put a plastic typewriter cover over Howard's head and held it tight around Howard's neck.

Howard alleges that he blacked out because he was unable to breathe due to the plastic typewriter cover over his head. The Defendants then allegedly slapped Howard's face until he regained consciousness, whereupon they again asked Howard if he was ready to confess. Howard did not confess.

The Defendants then allegedly resumed the beating, striking Howard primarily in the stomach and chest. When the Defendants started to put the plastic typewriter cover over Howard's head for another round of asphyxiation, Howard told the Defendants he would tell them whatever they wanted him to say. Howard alleges that he did so, however, only because of

the torture, and because of his fear that they would eventually kill him if he continued to resist their attempts to coerce his confession.

Howard alleges that two witnesses in the lock-up area who observed Howard shortly after the beating (Byron Hopkins and Theodore Hawkins) both corroborated that Howard appeared battered when he emerged from the interrogation room, and a third witness heard Howard's screams. One of these witnesses also allegedly observed a police officer emerge from the room with the plastic cover and put it back over a typewriter. Moreover, by the time Howard was sent to the Cook County Jail after his confession, medical professionals allegedly noted and documented new injuries on his body which further corroborated the beating.

At approximately 4:00 a.m. on the date Howard confessed, the Defendants took Howard to the scene of the Ridgell murder. One of the officers allegedly kept saying "he's not going to do it," or words to that effect, suggesting the belief that Howard might refuse to confess to the murder when the time came for his court reported statement. At that point, the Defendants allegedly uncuffed Howard and instructed him to run. Due to his belief that the police would shoot him if he obeyed the command, Howard refused to run.

On the way back to the station, one of the officers allegedly hit Howard in the stomach again and reminded him that he "had better sign," or words to that effect. After returning to Area 2 Headquarters sometime around 5:00 a.m. on November 3, the police returned Howard to the same interrogation room where he allegedly had been beaten and tortured. Howard remained in the room until the Assistant State's Attorney arrived to take his statement.

Howard alleges that, because he was fearing for his life, he followed Defendants' instructions and confessed to a crime he did not commit. Howard alleges that he would not have confessed falsely to the Ridgell murder but for Defendants' torture and threats.

Howard also alleges that the Defendants manipulated a witness, Byron Hopkins. Howard alleges that one or more of the Defendants improperly exerted influence on Mr. Hopkins by threatening him and persuading him to refrain from providing exculpatory information to Howard's defense. Mr. Hopkins fled the State of Illinois without revealing to Howard's defense the allegedly exculpatory information in his possession. In addition, Howard alleges that the Defendants also manipulated and otherwise tainted other witness testimony in order to frame him for a murder he did not commit.

In 1987, Howard's case went to trial. The alleged coerced confession was admitted into evidence at trial, and Howard was convicted of the Ridgell murder. On April 15, 1987, he was sentenced to death. Howard's murder conviction was affirmed on direct appeal to the Illinois Supreme Court. *People v. Howard*, 147 Ill.2d 103, 588 N.E.2d 1044 (1991). Howard's murder conviction was never overturned on appeal or through post-conviction proceedings.

Howard alleges that all of his injuries were proximately caused by a policy and practice on the part of the City of Chicago. Specifically, Howard alleges that throughout the 1980s, a group of Chicago Police Officers in Area 2 under the command of Defendant Jon Burge engaged in systematic torture and abuse in attempting to extract confessions from suspects to solve crimes more expediently and to enhance their personal standing in the Department. This allegedly was known to the command personnel, who themselves participated in the torture. Howard alleges that, when Burge was subsequently transferred to Area 3, the alleged torture shifted to Area 3.

Howard alleges that the systematic torture in which certain Area 2 and 3 personnel were engaged included electric shocks administered to the testicles and other parts of the body from a small black box, electric shocks with what is now believed to be a cattle prod, suffocation to the point of unconsciousness with plastic bags and a typewriter cover, Russian roulette, burnings, severe beatings, and threats of death. Howard alleges that there were up to ninety known victims of this torture. At least thirteen of these individuals ended up on Death Row with Howard.

Howard alleges that, because his conviction was improperly secured by the means of Area 2 police torture under Commander Burge, he was pardoned by then-Governor Ryan on the grounds of innocence. Howard alleges that three other innocent individuals were similarly pardoned by Governor Ryan.

Howard alleges that the alleged coercive interrogations were allowed to take place because the City declined to implement any mechanism for oversight or punishment. The complaint alleges that findings reveal that there was a pattern and practice of torture of suspects by Area 2 Violent Crimes detectives during the time period relevant to this case. The Chicago Police Department's Office of Professional Standards conducted a study and concluded in November 1990 that physical abuse occurred at Area 2 and it included psychological coercion and physical torture (hereinafter referred to as "Goldston report"). Howard alleges that as a result of the beatings and physical abuse administered by the Defendant officers, he suffered physical pain and discomfort. He also allegedly suffered mental anguish and emotional distress.

Howard's case was reopened by OPS. The subsequent re-investigation reversed the original exonerations and sustained the finding of wrongdoing on the part of the accused officers. Howard alleges that Defendant Hillard and Defendant Needham made a secret decision to shelve

all of these new OPS findings. As a result, this exculpatory information was withheld from Howard's defense team for almost a decade as he continued to reside on Death Row litigating his post-conviction position in the Illinois Courts. Howard alleges that had the information been provided to Howard rather than suppressed, his post-conviction proceedings would have been resolved favorably to Howard.

Plaintiff spent fifteen years on Death Row before the former Governor of Illinois, George Ryan, granted Howard a full pardon on the grounds of innocence. Howard was then released from prison.

Howard then brought this fifteen-count complaint against the City of Chicago, and the following members of the CPD in their individual capacities: Chicago Police Commander Jon Burge, Detective Robert Dwyer, Detective James Lotito, Detective Daniel McWeeny, Detective John Paladino, Detective John Byrne, Detective Ronald Boffo, Detective Frank Glynn, Superintendent Leroy Martin, Superintendent Terry Hillard, CPD General Counsel Thomas Needham, and Chief Administrator of OPS Gayle Shines.

Counts I-VII, and IX are brought pursuant to 42 U.S.C. § 1983. In Count I, Howard alleges that Defendants Byrne, Lotito and Boffo used excessive force against him which purportedly resulted in a coerced confession. Howard also claims in Count I that Defendants Burge and Martin should be held liable for this alleged misconduct because of their supervisor capacity.

In Count II, Howard alleges that "some of the defendants" stood by without intervening to prevent Byrne, Lotito and Boffo's alleged use of excessive force. In Count III, Howard alleges a due process claim whereby all of the individual Defendants deprived him of his constitutional

right to a fair trial by deliberately withholding exculpatory evidence and by fabricating false reports. Again, Howard seeks to hold Defendants Burge and Martin liable in their supervisory capacities. Additionally, Howard also seeks to hold former Superintendent Hillard liable in Count III under a conspiracy theory. Howard seeks to hold attorneys Gayle Shines and Thomas Needham liable under a conspiracy theory as well.

Howard brings a false imprisonment claim against all Defendants in Count IV. In Count V, Howard alleges an equal protection claim against all Defendants because the alleged misconduct "affected minorities in a grossly disproportionate manner *vis-a-vis* similarly situated Caucasian individuals." In Count VI, Howard claims that Defendants violated his right to counsel which resulted in the confession upon which the conviction is based.

In Count VII, Howard brings two § 1983 conspiracy claims. He alleges that the police officer Defendants and the OPS Defendants agreed that if any member of the Chicago Police Department were accused by citizens of wrongdoing, then the OPS employees would endeavor to deem those citizen complaints unfounded or unsustained. Howard also alleges that after the murder at issue, the Defendant Officers conspired to frame Howard for the Ridgell murder. Howard also alleges that the conspiracy was also undertaken for the purpose of punishing Howard for exercising his First Amendment right to speak out about matters of public concern.

In Count IX, Howard claims that he was denied his right of access to the courts. Howard alleges that Defendants wrongfully suppressed information and evidence which deprived him of constitutional claims against certain potential defendants.

Count VIII alleges conspiracy under 42 U.S.C. § 1985. Count XI alleges a state law claim for malicious prosecution. Count XII alleges a state law claim for civil conspiracy. Count

XIII alleges intentional infliction of emotional distress. Count XIV seeks to hold the City liable under a respondeat superior theory. Finally, Count XV seeks indemnification by the City because the Defendant Officers were employees of the Chicago Police Department who were acting within the scope of their employment.

Howard does not bring a separate *Monell* policy claim against the City. Rather, in Count I, he contends that the alleged misconduct "was undertaken pursuant to a policy and practice of the Chicago Police Department." Howard further alleges that the alleged misconduct referred to in Counts II-IX was undertaken pursuant to the City's or the Chicago Police Department's policy and practice "in the manner described in the preceding paragraphs."

Defendants have now moved to dismiss several counts of the complaint. We will address each of their arguments in turn.

## DISCUSSION

For purposes of this motion to dismiss, the court accepts as true all well pled factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Cornfield v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1324 (7th Cir. 1993). The court is permitted to take judicial notice of matters of public record on a Rule 12(b)(6) motion to dismiss without converting it to one for summary judgment. *Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir. 1996). The court must grant a motion to dismiss, however, when it appears beyond a doubt that plaintiff can provide no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

Defendants first seek to dismiss all of Howard's claims as barred by the doctrine of collateral estoppel. The Seventh Circuit has held that because collateral estoppel is an

affirmative defense, it is not a valid ground for dismissing a complaint. *United States Gypsum Co v. Indiana Gas Co., Inc.,* 350 F.3d 623, 626 (7th Cir. 2003). Rather, it is more appropriate to consider this defense during summary judgment proceedings. *Id.* Because we cannot decide Defendants' collateral estoppel arguments without considering matters outside of the pleadings, we decline to dismiss the complaint pursuant to Rule 12(b)(6) based on collateral estoppel. Defendants may raise this argument again at the summary judgment stage.

I. Counts I and II: § 1983 Coerced Confession and Failure to Intervene Claims

Defendants next argue that Howard's claims in Count I (coerced confession) and Count II (failure to intervene) are barred by the applicable statute of limitations.

A. Section 1983 Claims

The appropriate statute of limitations for Howard's § 1983 claims is the limitations period for personal injury claims in the forum state where the alleged constitutional violation occurred. *Wilson v. Garcia,* 471 U.S. 261, 269 (1985). In Illinois, the statute of limitations for § 1983 claims is two years. *See Wiley v. City of Chicago,* 361 F.3d 994, 996 (7th Cir. 2004). Although state law determines the limitations period for § 1983 actions, federal law determines when a §1983 action accrues. *Sellars v. Perry,* 80 F.3d 243, 245 (7th Cir. 1996). The parties agree that, unless the principles enunciated in *Heck v. Humphrey,* 512 U.S. 477 (1994) operate to postpone the accrual of Howard's claims which are based on conduct that occurred in 1984, his claims are time-barred. *See Hobley v. Burge,* 2004 WL 1243929, at * 4 (N.D. Ill. 2004).

Under *Heck,* if a judgment for Howard on his § 1983 claims "would necessarily imply the invalidity of his conviction or sentence" the statute of limitations does not begin to run until the plaintiff's conviction or sentence has been favorably terminated. *Heck,* 512 U.S. at 486-87.

10

Thus, to toll the running of the statute of limitations, a § 1983 plaintiff first "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. " *Hobley, at \*4, citing Heck*, 512 U.S. at 486-87.

In this case, Defendants seem to agree that Howard's pardon on grounds of innocence invalidated his conviction under the *Heck* guidelines. However, they instead argue that the accrual of the statute of limitations was not postponed by *Heck*, but instead began to run at the time the alleged wrongs occurred.

Defendants argue that Howard's claims for coerced confession and failure to intervene are untimely because they should have been brought within two years of his arrest in 1984. In *Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003), the Seventh Circuit held that a categorical exclusion of all Fourth Amendment claims from *Heck* is not warranted. While, in general, claims for coerced confession and failure to intervene should be brought immediately because the injury is compensable even if the defendant is subsequently convicted, the accrual of the civil rights claims is ultimately governed by *Heck. See Wiley v. City of Chicago*, 361 F.3d 994, 997 (7th Cir. 2004). Therefore, we will analyze whether success on Howard's claims would necessarily imply the invalidity of Howard's conviction—for if it does, then the statute of limitations is tolled until the time of Howard's pardon.

With respect to Howard's claim that his confession was involuntary, it is well settled that a conviction that is based on a false confession coerced by torture violates due process. *Brown v. Mississippi*, 297 U.S. 278 (1936). However, a coerced confession is subject to harmless error

analysis. *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991). Therefore, the limitations period is not automatically tolled in every case when an involuntary confession was used to obtain a conviction. *See Simmons v. O'Brien*, 77 F.3d 1093, 1095 (8th Cir. 1996). Similarly, although it is possible that conduct of the police officers involving torture might also impugn the validity of a conviction, it is not always so. *See Gonzalez*, 133 F.3d at 553.

The cases which have concluded that similar claims would imply the invalidity of a conviction and hence toll the limitations period are those when the violation yielded a confession, or other evidence, which directly led to a conviction. *See, e.g., Johnson v. Village of Riverdale*, 192 F. Supp.2d 874, 875 (N.D. Ill. 2002). In *Johnson*, there was no evidence other than the coerced confession to implicate plaintiff. Thus, plaintiff's §1983 action contending that his confession was a nullity, if successful, would necessarily have implied the invalidity of his conviction based solely on that confession. *Id.* at 876.

In this case, Howard alleges that the only evidence used at trial to convict him for the murder was his involuntary confession and the coerced and fabricated testimony of another witness. There was no physical evidence linking him to the crime and no witness testimony other than that which allegedly was fabricated by Defendants implicating him in the murders. Although Defendants insist that the witness testimony alone was enough to convict Howard, he alleges that the witness testimony was procured by Defendants' intimidation.

Since Howard's conviction rested almost entirely on his involuntary confession plus the alleged coerced witness testimony, we conclude that Howard could not have challenged Defendants' acts of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction. Under *Heck*, Howard's §1983 claims for coerced confession and

abuse and torture did not accrue until his conviction was overturned in January of 2003. Since

Howard filed this suit on November 24, 2003, his claims in Counts I and II are timely.

Therefore, Defendants' motion to dismiss Counts I and II is denied.

## II. Count III: § 1983 Due Process Claim

The third of Howard's fifteen claims asserts a violation of his due process rights under

the Fifth and Fourteenth Amendments of the U.S. Constitution. Howard claims that all of the

individual defendants "deliberately withheld exculpatory evidence, as well as fabricated false

reports and other evidence" in order to mislead and misdirect the state criminal prosecution of

the plaintiff.

Defendants raise several objections to this claim in their motion to dismiss. First,

defendants argue that Howard's § 1983 due process claims are time-barred. Second, the

defendants have "absolute immunity against any claims that they falsely testified concerning

Howard or any other witnesses' admissions or that they conspired and/or concealed the fact that

their testimony was allegedly false or fabricated." Third, Defendants claim that the availability of

an Illinois common law tort action for malicious prosecution "knocks out any constitutional

theory of malicious prosecution." Finally, Defendants claim that because plaintiff was present in

his interrogation, he had access to the same allegedly exculpatory evidence as the state. The

Court will address each of these arguments in turn.

Defendants first argue that Howard's due process claim is untimely. In his due process

claim, Howard alleges that his right to a fair trial was violated because Defendants fabricated

inculpatory evidence and withheld exculpatory evidence. Howard's claim is similar to that raised

in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001). In *Newsome*, the defendants

allegedly failed to notify prosecutors that plaintiff's fingerprints did not match those obtained at the scene of the crime, withheld information about the fact that they encouraged witnesses to pick plaintiff out of a lineup, and otherwise tainted the witness identification process. *Id.* at 749. The Seventh Circuit held that because plaintiff had a right to this information pursuant to *Brady*, the failure to turn over the information necessarily raised questions about the validity of his conviction. Thus, the accrual of plaintiff's claim under due process was postponed by *Heck* until plaintiff was pardoned. *Id.* at 752. Therefore, the Seventh Circuit held that the plaintiff had a timely due process claim.

Likewise, in this case, Howard alleges that Defendants fabricated inculpatory evidence, withheld exculpatory evidence, and denied him a fair trial. Howard alleges that he had a right to the information pursuant to *Brady* and that the failure to turn over the information necessarily raised questions about the validity of his conviction. We agree. The *Heck* ruling supports Howard's allegations that the tainted witness identifications and withheld evidence undermine the validity of his conviction. Thus, the accrual of Plaintiff's claim under due process was postponed by *Heck* until Howard was pardoned. Accordingly, Howard's due process claim is timely.

Second, defendants argue that Howard's due process claim should be dismissed because, even if the Defendants used false testimony to deprive Howard of his right to a fair trial, they are immune from such a claim under *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983). In *Briscoe,* the Supreme Court held that law enforcement officials are absolutely immune against claims of false or perjured testimony even if that testimony allegedly deprived a party of his right to a fair trial.

However, an exception to the rule of absolute testimonial immunity exists for

"complaining witnesses." *Cervantes v. Jones*, 188 F.3d 805, 809 (7th Cir. 1999). A complaining witness "is one who actively instigated or encouraged the prosecution of the plaintiff." *Cervantes*, 188 F.3d at 809. In this case, Howard alleges that "but for the Defendants' misconduct, Mr. Howard would neither have been prosecuted nor convicted." Complaint at paragraph 55. It is reasonable to infer from this allegation that Defendants could qualify as complaining witnesses exempt from absolute immunity. The inquiry into who qualifies as a complaining witness is highly fact-specific and should not be resolved on a motion to dismiss. *Cervantes*, 188 F.3d at 810; *Ieneco v. City of Chicago*, 286 F.3d 994, 1000 n. 9 (7th Cir. 2002) (declining to decide on appeal fact-intensive issue of whether complaining witness exception applies). Viewing Howard's complaint in the light most favorable to him, the allegations suggest that defendants are complaining witnesses exempt from absolute testimonial immunity. Therefore, we decline to dismiss the due process claim on this basis.

Third, Defendants attempt to avoid liability on the § 1983 due process claim by arguing that Howard's allegations are "knocked out" because of the availability of a tort claim under state law. However, this precise argument was heard and definitively rejected by Judge Kennelly in *Carroccia v. Andersen*, 249 F. Supp.2d 1016 (N. D. Ill. 2003). In *Carroccia*, an acquitted murder defendant brought § 1983 due process claims against police officers. The court rejected defendants' argument that available state court remedies bar Carroccia's due process claims. The court held that the state law actions which the defendants identified offered no remedy for the *Brady* violations.

The Defendants here offer the exact argument citing available state law tort claims for malicious prosecution. Malicious prosecution claims require allegations that the Defendants

commenced or continued criminal proceedings against the plaintiff without probable cause. *Joiner v. Benton Community Bank*, 411 N.E.2d 229, 232 (1980). Howard's claims, however, arise from allegations that Defendants concealed exculpatory evidence from prosecutors, thereby denying him the right to a fair trial. Because Defendants have not identified a state law claim that addresses Howard's particular due process claims, he cannot be precluded from asserting a constitutional tort claim on this basis. *Cf. Newsome*, 256 F.3d at 752.

Fourth, Defendants claim that Howard was present during his own interrogation and, therefore, knew of and had access to the same allegedly exculpatory evidence as the State. Defendants claim that since the prosecution has no duty to disclose what the accused already knows, no *Brady* violation occurred. Defendants rely on *Gauger v. Hendle*, 2002 WL 31130087 (N. D. Ill. 2002) and while this statement of the law is correct, additional factual allegations in Howard's complaint make this a markedly different case from *Gauger*. The *Brady* violation alleged in *Gauger* was based entirely on evidence obtained during the state's interrogation of the accused. In this case, Howard charges Defendants with hiding the fact that his confession was coerced and fabricated. While this allegation alone might not state a Brady claim after *Gauger*, Howard further accuses defendants of obstructing justice and violating his right to a fair trial through actions they took outside of the interrogation room.

Howard's complaint states that Defendants tortured him, coerced a "confession" out of him, manipulated and intimidated witnesses, and knowingly used the power of the State to bring charges against him and obtain a conviction for a murder they knew he did not commit. Additionally, Howard claims that Defendants effectuated a pattern and practice of torture and coerced confessions in Area 2. Howard further claims that he was not made aware of this

evidence until it was made public by court order in other proceedings and in the Goldston report and subsequent OPS findings.

Taking Howard's allegations as true, as we must, these claims contain all of the elements of a *Brady* violation and sufficiently charge a deprivation of constitutionally guaranteed due process rights. First, evidence that the Defendants who interrogated, charged, and prosecuted Howard committed numerous other acts or torture, including suppressing evidence other than Howard's own abuse and coerced confession is exculpatory. Second, Howard avers that Defendants intentionally suppressed this evidence and their efforts to frame him for murder from prosecutors, judges and defense counsel before, during, and after his trial. Third, Defendants' suppression of this evidence caused Howard to be convicted of a crime he did not commit and to deny him relief in post-conviction proceedings. These allegations support Howard's claim that he suffered a deprivation of his constitutional right to a fair trial. Therefore, we reject Defendants' contention that Howard had access to the same exculpatory evidence as the State, and we decline to dismiss Howard's due process claim on that basis.

For all of these reasons, Defendants' motion to dismiss Howard's § 1983 due process claims is denied.

### III. Count IV: False Imprisonment

In Count IV, Howard asserts a claim for false imprisonment under § 1983. Defendants are correct in asserting that the "existence of probable cause is an absolute defense to a § 1983 false imprisonment claim." Howard was arrested on an unrelated warrant on November 1, 1984 and was subsequently convicted under that warrant. Nowhere in his complaint does Howard plead that the warrant issued for his arrest on November 1, 1984 was invalid. Thus, Howard's claim for

false arrest is dismissed.

### IV. Count V: Equal Protection

In Count V, Howard alleges an equal protection violation. In order to state a viable §
1983 equal protection violation, Howard must allege: 1) that he is a member of a protected class;
2) that he was similarly situated to members of an protected class; 3) that he was treated
differently than members of the unprotected class; and 4) that defendants acted with a
discriminatory intent. *Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001).

In this case, Howard has done just that. He alleges that he is African American and that
he and other African Americans were treated differently than similarly situated Caucasians.
Specifically, he claims that Defendants' misconduct "affected minorities in a grossly
disproportionate manner vis-à-vis similarly-situated Caucasian individuals." Moreover, his
complaint avers that the Defendants' "misconduct was motivated by racial animus and
constituted purposeful discrimination."

Defendants argue that because the alleged conduct which forms the basis of Howard's
equal protection claim occurred at the time of his interrogation in 1984, his claim for equal
protection is time barred for the same reasons the "excessive force claim in Count I is barred."
We disagree. In *Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir. 1995), the Seventh Circuit held
that a claim for deprivation of equal protection rights was barred by *Heck* until the conviction
was invalidated. Therefore, because Howard filed this claim within two years of his pardon, we
find the claim to be timely.

For these reasons, we find that Howard has adequately stated a claim for violation of
equal protection, and the motion to dismiss is denied.

18

## V. Count VII and VIII: Civil Rights Conspiracy Claims

Howard alleges three conspiracy claims. Count VII alleges a conspiracy claim under 42 U.S.C. § 1983, Count VIII alleges a conspiracy claim under 42 U.S.C. § 1985(3), and Count XII alleges a state law conspiracy claim.

Defendants first argue that the § 1983 conspiracy claim in Count VII and the state law conspiracy claim in Count XII are time-barred because a conspiracy claim accrues when plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. Defendants argue that Howard in this case was aware of all of the alleged misconduct making up his conspiracy claim by the time of his first criminal trial. However, Howard's conspiracy claims are based upon Defendants' alleged conspiracy to conceal and withhold exculpatory evidence, fabricate inculpatory evidence, and subject him to excessive force. The timeliness analysis used to address the accrual of each of the constitutional violations that make up the conspiracy therefore also applies to the conspiracy based on those acts. *See Castillo v. Zuniga*, 2002 WL 398519 at *10 (No. 01-616, N.D. Ill. Mar. 14, 2002).

Because we found that Howard's claims for coerced confession, failure to intervene and due process were timely, the conspiracy to deprive him of those rights is also timely. Moreover, we find that under the *Heck* analysis, Howard's conspiracy claim would also be timely. Howard's conspiracy claim is based upon Defendants' alleged conspiracy to violate Howard's constitutional rights by withholding exculpatory evidence, fabricating inculpatory evidence, and coercing a confession. This claim, if successful, implies invalidity of his conviction and would not accrue until Howard's pardon. For these reasons, Defendants' motion to dismiss the § 1983 and state law conspiracy claims based on statute of limitations grounds is denied.

Defendants next argue that Howard's conspiracy claims are barred by the intra-corporate conspiracy doctrine, and the conspiracies alleged fail to state a claim upon which relief can be granted. The court will address both arguments in turn.

Defendants first argue that Howard's conspiracy claims are barred by the intra-corporate conspiracy doctrine. Under the intra-corporate conspiracy doctrine, employees and managers of a corporation who are jointly pursuing its lawful business, are not considered to be conspirators when acts within the scope of their employment are said to be discriminatory or retaliatory. *Wright v. Illinois Dept. of Children and Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994). In *Wright*, the Seventh Circuit applied the doctrine to bar claims brought under 42 U.S.C § 1985 against governmental entities. Thus, the intra-corporate conspiracy doctrine bars Howard's § 1985 conspiracy claims and Defendants' motion to dismiss is granted with regard to Count VIII.

However, the Seventh Circuit has not determined whether the doctrine extends to § 1983 conspiracy claims. In fact, several judges in this district have refused to apply the doctrine to cases involving allegations of police misconduct. For example, in *Newsome v. James*, the plaintiff, who was pardoned by the governor after spending fifteen years on death row, brought § 1983 claims against several police officers alleging that they framed him for murder. No. 96-7680, 2000 WL 528475 (N. D. Ill. Apr.26 2000). In their motion for summary judgment, defendants in the *Newsome* case argued that the intra-corporate conspiracy doctrine barred plaintiff's § 1983 civil conspiracy claim. Judge Plunkett declined to extend the doctrine to plaintiff's allegations. In doing so, the court explained that the intra-corporate conspiracy doctrine was developed "to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions." *Id.* at 16. The court held that framing the plaintiff for

murder was not the product of routine police department decision-making. *Id.* at 15. Likewise, Howard's allegations involve conduct that is far removed from routine, collaborative business decisions. Thus, we decline to dismiss Howard's § 1983 conspiracy claim based on the intra-corporate conspiracy doctrine.

Second, Defendants argue that Howard's "skeletal civil rights conspiracy claims lack any factual assertions suggesting the existence of an underlying agreement between the Defendants." In order to state a claim under § 1983, Howard must allege that he was deprived of a right secured by the constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law." *Kelley v. Myler*, 149 F.3d 641, 648 (7th Cir. 1998). To plead conspiracy under § 1983, Howard must "indicate the parties, general purpose, and approximate date, so that Defendant[s] ha[ve] notice of what [they are] charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). The federal notice pleading rules do not require Howard to provide direct evidence of the agreement between the conspirators or the overt acts performed in furtherance of the conspiracy. *Patterson v. Burge*, 2004 WL 1764520 (N. D. Ill.)

Howard alleges in his complaint that the Office of Professional Standards (OPS) entered into an agreement with the Defendants whereby the OPS "would actively endeavor to deem those citizen complaints unfounded or unsustained, even where police officers in fact violated citizens' rights." Howard also describes Defendants' alleged efforts to torture and abuse him, fabricate and suppress material exculpatory evidence, testify falsely and lie to prosecutors, judges and defense counsel about the torture and suppression of evidence against him; and conceal all of these actions throughout his trial and post-conviction proceedings until the day that he was pardoned. These assertions are more than sufficient to state a claim for conspiracy under § 1983 and, thus,

we decline to dismiss Count VII.

### VI. Count IX: §1983 Denial of Access to Courts

Howard's ninth claim alleges that Defendants denied his access to the courts by suppressing "information or evidence which deprived plaintiff of certain constitutional claims." The Supreme Court has recognized two categories of denial of access claims. *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). The first type of claim is "systemic official action" that frustrates a plaintiff in preparing or filing suits at the present time. *Id.* The second type of claim is when official acts have allegedly caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief. *Id.* at 414.

In this case, Howard's allegations fall into the second category. *Harbury* indicates that to properly plead an access to court claim, a plaintiff must demonstrate that a specific legal remedy was lost or could not otherwise be maintained through the misconduct of defendants. The plaintiff must specifically identify both the cause of action that was lost by virtue of government deception and must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. *Id.* at 415. This is where Howard fails. The object of a denial of access claim is simply the judgment in the access claim itself. It provides relief when no other future suit may provide that relief. But here, plaintiff may end up just as well off after litigating this case without the denial of access claim. We can find no remedy being sought independently of relief that might be available on the other fourteen counts set out in Howard's complaint. Thus, Defendants' motion to dismiss count IX is granted.

### VII. Defendants Martin, Shines, Hillard, and Needham

Defendants Martin, Shines, Hillard and Needham argue that there are insufficient allegations in Howard's complaint to support a finding that they were responsible for commencing or continuing any criminal proceedings against Howard. We agree with Defendants that they cannot be held liable under Counts I (coerced confession) and II (failure to intervene). However, Howard has stated a claim for due process and conspiracy against defendants Martin, Shines, Hillard and Needham. It is settled that actions by government officials which influence a plaintiff's post-conviction proceedings are not immune from suit. Howard claims that defendants Martin, Shines, Hillard, and Needham suppressed material exculpatory evidence in the form of the Goldston report that documented "systematic" and "methodical" abuse and "planned torture." Specifically, Howard alleges that Martin and Shines violated his due process by "suppressing the Goldston Report," keeping it a secret and showing it to no one. He further alleges that Hillard and Needham "made a secret decision to shelve" new O.P.S. findings that certain police officers were guilty of torturing suspects during interrogation and that Needham "wrote a confidential Memo instructing O.P.S. to close all of the cases and to re-classify all of these newly 'sustained' findings as 'non-sustained' to clear all of the officers." Reading Howard's complaint in the light most favorable to him, both his due process claim and his § 1983 conspiracy claim state a cause of action against defendants Martin, Shines, Hillard and Needham.

VIII. Defendants Dwyer, Glynn, McWeeny, Paladino, and Burge

Defendants McWeeny, Paladino, Dwyer, Glynn and Burge argue that they cannot be held liable in their individual capacities. We find that Howard has failed to state a claim against defendants Dwyer and Glynn. Plaintiff's complaint fails to allege any involvement on behalf of defendants Dwyer and Glynn in the actions taken against him. Defendants Dwyer and Glynn are

only mentioned in the examples of torture experienced by other suspects provided by plaintiff on pages 13-18 of his complaint. While this alleged involvement in torturing other suspects is very troubling, we cannot ignore the fact that Howard has failed to allege any involvement by Dwyer and Glynn with regard to the actions taken against him. Therefore, the motion to dismiss is granted as to defendants Dwyer and Glynn. If plaintiff's discovery produces information regarding defendants Dwyer and Glynn, he is free to amend his complaint. However, Howard has pled insufficient involvement by these two defendants.

Howard has stated sufficient allegations against defendants McWeeny, Paladino and Burge. Howard has alleged that defendants McWeeny and Paladino were present the evening that the events allegedly took place. He further alleges that they "had knowledge of the coercive interrogation and therefore had a reasonable opportunity to intervene." Complaint, ¶ 126. Howard further alleges that defendant Burge not only knew of the torture but also consented in his supervisory capacity. Complaint, ¶ 121. The Court agrees with plaintiff that, at this stage in the litigation, it is premature to dismiss the claims against these Defendants. Summary judgment may be appropriate after the discovery process is complete, but *Conley v. Gibson*, 355 U.S. 41, 45-47 (1957), teaches that, under the notice pleading system, plaintiffs have a right to reach the discovery stage unless it is clear beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Therefore, Defendants' motion to dismiss is denied as to defendants Burge, McWeeny and Paladino.

IX. Right to Counsel Claim

In Count VI, Howard alleges that Defendants violated his right to counsel. Howard claims that as a result of this alleged violation, his confession should not have been admitted into

evidence at his criminal trial.

Defendants argue that Howard's right to counsel claim should be dismissed as untimely. We disagree. If Howard's allegations are credited, his entire interrogation was illegal after the point he requested counsel, and his confession would have been suppressed. This claim necessarily implies the invalidity of his conviction. Therefore, for the reasons stated above, the accrual of this cause of action is postponed under *Heck. See Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir. 1995).

## XII. Intentional Infliction of Emotional Distress

Defendants next argue that Howard's state law claim for intentional infliction of emotional distress in Count XIII is untimely. We disagree. Many courts have held that a cause of action for intentional infliction of emotional distress does not accrue until the state criminal proceedings are terminated. *See, e.g., Bergstrom v. McSweeney*, 294 F. Supp.2d 961, 969 (N.D. Ill. 2003).

In this case, because the statute of limitations did not commence until the criminal case was terminated, and this federal action was filed within one year of Howard's pardon, his claim is not barred under the one-year limitations period set forth in the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10/8-101. Therefore, Defendants' motion to dismiss Howard's intentional infliction of emotional distress claim is denied.

## XIII. Malicious Prosecution

In Count XI, Howard alleges a claim for malicious prosecution against all of the individual defendants. Howard claims that he was improperly subjected to judicial proceedings

for which there was no probable cause. To state a claim for malicious prosecution under Illinois law, a plaintiff must plead: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceedings in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Joyner v. Benton Community Bank,* 82 Ill.2d 40, 45 (1980); *Ritchey v. Maksin,* 71 Ill.2d 470, 376 N.E.2d 991, 993 (1978).

Defendants argue that Howard cannot bring a malicious prosecution against Defendants Martin, Shines, Hillard and Needham because they did not commence or continue the criminal prosecution against Howard. Defendants argue that these Defendants were not involved in the investigation of the Ridgell murder or his interrogation nor does his complaint demonstrate that they took an active part in the prosecution or appeared as a witness at his criminal trial. Thus, Defendants claim that Howard cannot establish that these Defendants initiated his criminal proceedings.

Howard, however, alleges that Martin, Shines, Hillard and Needham suppressed and altered exculpatory information in an investigative report concerning accusations of torture and abuse by Area 2 police officers. Howard claims that this activity was conduct which had a causal effect on the continuation of the proceedings against him.

Reading the complaint in the light most favorable to Howard, we find that he has adequately alleged a cause of action for malicious prosecution against the individual Defendants at this stage of the litigation. Howard has alleged that these individuals were responsible for continuing the malicious prosecution against him. Therefore, we deny the motion to dismiss on this ground.

## XIV. State Law Conspiracy

In Count XII, Howard alleges a state law claim for conspiracy against all individual Defendants. Defendants have moved to dismiss this Count.

We find that Howard has adequately alleged a cause of action for conspiracy under Illinois law. Howard identifies the individual Defendants as part of the conspiracy and alleges that they agreed to violate his state law rights and committed overt acts in furtherance of the alleged agreement. We find that Howard's allegations are sufficient to put Defendants on notice as to the nature of the charge against them. Therefore, Defendants' motion to dismiss Count XII is denied.

## XV. Respondeat Superior and Indemnification Claims

In Counts XIV and XV, Howard seeks to hold the City liable for the violations of law allegedly committed by their employees, the individual Defendants. Defendants argue that because the individual Defendants cannot be held liable on Howard's state law claims in Counts XI through XIII, the City is immune from liability under § 10/2-109 of the Tort Immunity Act. That section provides that "[a] local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109.

However, as we have already ruled, Howard has stated claims for malicious prosecution, conspiracy, and intentional infliction of emotional distress against the individual Defendants. Thus, the City could be held liable for the alleged wrongful actions of its employees committed in the scope of their employment. Therefore, Defendants motion to dismiss Counts XIV and XV is denied.

## CONCLUSION

### XIV. State Law Conspiracy

In Count XII, Howard alleges a state law claim for conspiracy against all individual Defendants. Defendants have moved to dismiss this Count.

We find that Howard has adequately alleged a cause of action for conspiracy under Illinois law. Howard identifies the individual Defendants as part of the conspiracy and alleges that they agreed to violate his state law rights and committed overt acts in furtherance of the alleged agreement. We find that Howard's allegations are sufficient to put Defendants on notice as to the nature of the charge against them. Therefore, Defendants' motion to dismiss Count XII is denied.

### XV. Respondeat Superior and Indemnification Claims

In Counts XIV and XV, Howard seeks to hold the City liable for the violations of law allegedly committed by their employees, the individual Defendants. Defendants argue that because the individual Defendants cannot be held liable on Howard's state law claims in Counts XI through XIII, the City is immune from liability under § 10/2-109 of the Tort Immunity Act. That section provides that "[a] local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109.

However, as we have already ruled, Howard has stated claims for malicious prosecution, conspiracy, and intentional infliction of emotional distress against the individual Defendants. Thus, the City could be held liable for the alleged wrongful actions of its employees committed in the scope of their employment. Therefore, Defendants motion to dismiss Counts XIV and XV is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (# 22-1) is granted in part and denied in part. Defendants' motion to dismiss is granted with regard to Counts IV, VIII and IX. Thus, the remaining viable claims are as follows: Counts I, II, III, V, VI, VII, X, XI, XII, XIII, XIV, and XV. Counts I and II are dismissed against Defendants Martin, Shines, Hillard and Needham. Defendants Dwyer and Glynn are dismissed from this suit altogether.

Plaintiff Howard is given until November 17, 2004 to file an amended complaint. Defendants are given until December 17, 2004 to file their answers to the amended complaint.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: October 22, 2004