# EXHIBIT A

November 15, 2006

**Via Electronic Mail**

To:   Counsel of Record

cc:   Judge Geraldine Soat Brown (via personal delivery)

Re:   <u>Orange v. Byrd, etc., et al</u>

I would like to review the results of our conference of Tuesday, November 14, 2006.

The depositions that will be held at Peoples Law Office ("Peoples") will commence at 10:00 a.m. and the depositions that will be held at Freeborn and Peters (F&P) will commence at 9:00 a.m. unless otherwise noted. For those indicated with a question mark, we have reserved the date but need to confirm with the witnesses.

| Date | Name | Location |
|---|---|---|
| November 16 | Dennis McGuire | Peoples |
| November 21 | Daniel McWeeney | Peoples |
| November 22 | Diedre Irvin | F&P (1:00 p.m.) |
| November 22 | Sammy Lacy | F&P |
| November 28 | Robert Flood | Peoples |
| December 1 | Michael Bosco | Peoples |
| December 4 | Raymond Madigan | F&P |
| December 5 | Stanley Howard | F&P |
| December 6 | Rita Fry | F&P |
| December 7 | Raymond Binkowski | Peoples |
| December 8 | Peter Dignan | Peoples |
| December 11 | Leroy Martin | Peoples |
| December 12 & 13 | Doris Bird<br>William Parker<br>Melvin Duncan<br>Walter Young (?) | F&P<br>F&P<br>F&P<br>F&P |
| December 14 | John Byrne | Peoples |
| December 15 | Earl Washington | F&P (?) |
| December 18 | Gayle Shines | People |
| December 19 | Marie Jamison (?)<br>Patricia Moore (?)<br>Wanda Walton (?) | F&P<br>F&P<br>F&P |

888004/0006/912463/Version #:.1

In addition to these depositions, the following depositions remain to be completed: Leonard Badjinski; David Diogardi; and Stanley Howard.

We need to set dates for the following 404(b) victim depositions: Donald White; Tony Thompson; Michael Johnson; Melvin Jones; Eric Smith (located in Florida).

We also have to take the depositions of the following 404(b) police officers: John Pallidino; James Lettito; Anthony Mazlenka; Ronald Boffo; Michael McDermott; Michael Kill; and Patrick Garrity.

Additionally, we need dates for Terry Hillard, Raymond McNally and Leonard Kidd.

Based on our discussions, we also need to determine via rulings or to be filed motions the depositions of Mayor Daley, John Burge, Andrew Wilson and Jane Byrne, as well as the PRB depositions, including Governor Ryan and Matt Bettenhausen.

Additionally, prior to the Leroy Martin deposition we need to resolve the privilege issue.

Finally, true to my statement at the conference that I probably left someone out, I did. Jeff Kent, Frank Deboni, Gregory Ginex, William Kunkle need to have dates set.

Please notify me of any corrections.

# EXHIBIT B

# Freeborn & Peters LLP

December 20, 2006

**VIA EMAIL**

Joey L. Mogul
People's Law Office
1180 North Milwaukee Avenue
Chicago, IL 60622

*Attorneys at Law*

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Richard B. Levy
Direct 312.360.6246
Fax 312.360.6598
rlevy@
freebornpeters.com

Chicago

Springfield

Re: *Orange v. Burge, et al.*
Case No.: 04 C 0168

Dear Ms. Mogul:

As you know, defendants' motion to bar plaintiff's remaining claimed Rule 404(b) witnesses has been entered and continued before Judge Brown until January 8, 2007. Plaintiff has failed to comply with Judge Brown's order requiring plaintiff's counsel to ". . . advise defendants' counsel by December 4, 2006 whether plaintiff's counsel will present the witnesses for their depositions or provide the last known addresses of witnesses." Although I have renewed this request orally on multiple occasions, you have done neither.

On a related topic, Leonard Kidd was scheduled to give his deposition on December 28, 2006, at Stateville. At your request, and because you advised me that Sam Tenenbaum was not available, I accommodated your request to continue that deposition for a date certain. You provided the date of January 16, 2007 for Kidd's deposition and communicated that date to all counsel. I am now advised that Mr. Tenenbaum has already committed to that same date for the deposition of lawyer Earl Washington. Mr. Kidd is a witness represented by his own attorney. I cannot agree to any further continuance and I request that you confirm the January 16, 2007 date in writing so that necessary arrangements can be made.

Please respond to these requests as soon as possible.

Very truly yours,

Richard B. Levy

RBL/mk
cc: All counsel of record
Richard T. Sikes, Jr.
Michael P. Kornak
Terrence J. Sheahan

#1248493

# Freeborn & Peters LLP

December 28, 2006

<u>VIA E-MAIL</u>

Joey L. Mogul
Peoples Law Office
1180 N. Milwaukee Avenue
Chicago, IL 60622

*Attorneys at Law*

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Richard B. Levy
Partner
Direct 312.360.6246
Fax 312.360.6598
rlevy@
freebornpeters.com

*Chicago*

*Springfield*

Re: Orange

Dear Ms. Mogul:

As indicated in my letter of December 20, 2006, you remain in violation of Judge Brown's order of November 27, 2006 (Docket 381) requiring you to indicate which remaining claimed 404(b) witnesses you will present for deposition and/or provide their last known addresses. By your failure to respond, I can only assume that you will be withdrawing the following witnesses:

1. Donald White;
2. Tony Thompson;
3. Michael Johson;
4. Melvin Jones, and
5. Eric Smith.

Please confirm in writing to avoid any additional waste of time and expense.

Further, we have repeatedly requested contact information (last known address, phone) for former Detective Walter Young, who you claim as a witness. Please provide this information or we will also request that he be barred from testifying.

Sincerely,

Richard B. Levy

RBL/kmd

cc: Counsel of Record
    Orange Team

# EXHIBIT C

(708) 788-9040

Brehon Reporting

1930 South Home Ave.
Berwyn, IL 60402

CONDENSED TRANSCRIPT AND CONCORDANCE

PATTERSON -v- BURGE, et al., 03 C 4433
ORANGE -v- BURGE, et al., 04 C 00168
HOBLEY -v- BURGE, et al., 03 C 3678
HOWARD -v- BURGE, et al., 03 C 8481
CANNON -v- BURGE, et al., 05 C 2192

DEPOSITION OF JOHN EDWARD BYRNE
VOLUME I   PAGES 1 to 283

DECEMBER 15, 2006

PREPARED BY:

Brehon Reporting

1930 South Home Avenue

Berwyn, Illinois 60402

(708) 788-9040

73

A   Yes.
Q   All right. And did he -- did you agree to pay him any money?
A   No, I did not.
Q   And how was he paid?
A   I don't know.
Q   Was it your understanding that he was being paid by the City of Chicago?
A   I believe --
MR. LEVY:   Objection to what his understanding was. It calls for speculation.
You can answer.
THE WITNESS:   I believe he's being paid by the City of Chicago. I have not been told that, I don't know that. But that's my assumption.
BY MR. TAYLOR:
Q   All right. Now, I want to mark this as -- let's see here. Sometime in -- in August of 2004, you gave a deposition in this case, the Patterson case, right?
A   Are you referring to, uh, when we were at Stateville prison?
Q   No. I mean here.
A   Oh, yes. Yes. That's when I took the

74

Fifth Amendment.
Q   Right. And that was August 20th of 2004; is that right?
A   Well, that sounds correct.
Q   Okay. Well, let me -- let me show you the deposition so we can just get the date established here.
A   If that's what it says on it, I will agree to that.
Q   Okay. Well, let's --
MR. SOTOS:   We'll stipulate it was August 20th.
MR. TAYLOR:   Okay. I just want to mark it anyway.
(WHEREUPON, Byrne Exhibit 4 was marked and tendered to Witness.)
THE WITNESS:   Yes. It was August 20th, 2004.
BY MR. TAYLOR:
Q   And at that deposition you took the Fifth Amendment to literally hundreds of questions I asked you about your involvement at -- at Area 2 and allegations of torture and abuse that had been lodged against you by numerous persons; is that fair to say?
MR. LEVY:   Object to relevance.

75

You can answer.
THE WITNESS:   I wouldn't say, "Hundreds of questions." I'd -- several probably, 90 to a hundred maybe, 80 to a hundred.
BY MR. TAYLOR:
Q   Well, there were -- it was --
A   It was a lot.
Q   -- a lengthy deposition, right?
A   All of your depositions --
(WHEREUPON, there was laughter.)
-- seem to be lengthy.
Q   Yeah. You're right. And this one is particularly --
MR. LEVY:   We'll stipulate to that.
MR. TAYLOR:   -- going to be length -- particularly lengthy, I'm sure.
MR. SOTOS:   You mean we're not almost done?
MR. TAYLOR:   It depends on what you mean by that.
BY MR. TAYLOR:
Q   Now, prior to your taking the Fifth Amendment at that deposition, you also submitted interrogatory answers, did you not?
A   I believe so.

76

Q   Okay.
A   Yes.
MR. TAYLOR:   And let me mark this as Plaintiff's Exhibit 5 -- is that right?
MS. REPORTER:   5.
(WHEREUPON, Byrne Exhibit 5 was marked and tendered to Witness.)
BY MR. TAYLOR:
Q   Now, in these interrogatories, you -- you saw these interrogatories prior to your signing them in July of 2004; is that right?
A   Yes. Yes.
Q   And you prepared these answers to these interrogatories, did you not?
A   Yes.
Q   And you were asked in these interrogatories about various cases where allegations of brutality and torture were -- had been lodged against you; isn't that right?
A   Yes.
Q   And rather than deny that those al -- that -- that those events occurred or to admit to them, you took the Fifth Amendment; is that right?
A   Yes.

77

1  Q   And that was -- and you verified that
2  under oath on July 7th, 2004; is that right?
3  A   Yes.
4  Q   So you had told the special prosecutor
5  in 2003 that you wanted to cooperate with him and
6  answer all his questions if he asked them about
7  torture at Area 2 and your involvement, right?
8       MR. LEVY: Asked and answered.
9       You can answer.
10      THE WITNESS: Yes, I told him that. Yes.
11 BY MR. TAYLOR:
12 Q   And yet the next year in July, you
13 chose to take the Fifth Amendment as to those
14 substantive questions about torture at Area 2, right?
15 A   Yes.
16 Q   And then on August 20th, you did so
17 again, right, in even more detail in terms of more
18 questions about torture at Area 2?
19 A   Well, I didn't take the Fifth in more
20 detail.
21 Q   Well, you took --
22 A   There were --
23 Q   -- the -- well, let --
24 A   There were more questions --

78

1  Q   Right.
2  A   -- apparently.
3  Q   There was -- right.
4  A   But I took the Fifth both times.
5  Q   Right. And why did you do that?
6  A   My counsel advised me to do that.
7  Q   All right. And your counsel was --
8  A   Richard --
9  Q   -- Freeborn & Peters at that time?
10 A   Yes.
11 Q   At that point had you any other
12 lawyers other than Freeborn & Peters?
13      MR. LEVY: Objection.
14      THE WITNESS: I don't -- I don't believe so.
15 No.
16 BY MR. TAYLOR:
17 Q   All right. And did they tell you or
18 did you -- strike that.
19      Other than your lawyers telling you to
20 do so, was there any additional reason for you to
21 take the Fifth Amendment?
22 A   Well, let me clarify something,
23 Mr. Taylor. My lawyers didn't tell me to do so.
24 What I just testified to a moment ago was I was

79

1  advised by counsel to take the Fifth Amendment. I
2  took that advisement and I took the Fifth Amendment.
3  Nobody told me what to do.
4  Q   So you took your advice (sic) of your
5  counsel and you took the Fifth Amendment?
6  A   That is correct.
7  Q   And that was contrary to what you told
8  the special prosecutor that you wanted to do; isn't
9  that right?
10      MR. LEVY: Objection. This is argumentative.
11      MR. NOLAND: Asked and answered.
12      THE WITNESS: It's not contrary. It's a
13 decision I made -- I did not have counsel when I
14 spoke to Mr. Egan, Mr. Boyle, and Mr. Murtaugh in
15 June of '03. A year later when I had counsel, I took
16 the advice of counsel. I don't consider that
17 contrary to what I told Mr. Egan, Boyle, and
18 Murtaugh.
19 BY MR. TAYLOR:
20 Q   And did you take the Fifth Amendment
21 because of a belief that you might incriminate
22 yourself with regard to the ongoing special
23 prosecutor's investigation?
24      MR. LEVY: Objection to the form of that

80

1  question.
2       THE WITNESS: I took the Fifth Amendment on
3  advice of counsel.
4       MR. TAYLOR: Could you read back the question,
5  please.
6            (WHEREUPON, the Record was read as
7            follows:
8            "Question: did you take the
9            Fifth Amendment because of a
10           belief that you might
11           incriminate yourself with regard
12           to the ongoing special
13           prosecutor's investigation?")
14      MR. LEVY: I'll object. That calls for a
15 legal conclusion.
16      You can answer.
17      THE WITNESS: I -- I did not take the Fifth on
18 a belief that I might incriminate myself because had
19 I testified, I would have told the truth and I don't
20 believe telling the truth would have incriminated
21 myself. I took the Fifth, once again, on advice of
22 counsel.
23 BY MR. TAYLOR:
24 Q   So you took the Fifth despite your own

```
                                                                81
 1   belief that you had nothing to hide and therefore
 2   would not incriminate yourself; is that a fair --
 3        A    Well --
 4        Q    Is that a fair statement?
 5        A    -- I wouldn't say in spite of.  I -- I
 6   had a belief that I had nothing to fear, nothing to
 7   hide, and telling the truth would not incriminate me
 8   in any way.  But, once again, I took the Fifth on
 9   advice of counsel.
10        Q    All right.  Well, four days later you
11   returned to the special prosecutor's office and spoke
12   with them again, didn't you?
13        A    No.
14        MR. TAYLOR:  Well, let me mark this as Exhibit
15   Number 6.
16             (WHEREUPON, Byrne Exhibit 6 was
17              marked and tendered to Witness.)
18   BY MR. TAYLOR:
19        Q    Have you had an occasion to look at
20   the document I have --
21        A    Yes.
22        Q    -- marked?
23        A    Yes.
24        Q    And this is a --
```

```
                                                                82
 1        A    My answer stands.
 2        Q    All right.  Well, let me ask you some
 3   questions about it.  Did you meet with Boyle and Egan
 4   on August 24th, Tuesday, August 24th, 2004, pursuant
 5   to the grand jury subpoena that they had served on
 6   you?
 7        A    Yes.
 8        Q    And you were not with counsel; is that
 9   fair to say?
10        A    That is fair.
11        Q    And --
12        A    That is correct.
13        Q    -- you told --
14        A    More than fair.  It's correct.
15        Q    Did you tell Boyle and Egan that you
16   didn't need a lawyer and -- as reflected in this
17   memo?
18        A    Yes.
19        Q    And did you tell --
20        A    In essence, yes.
21        Q    Okay.  And did you tell them that you
22   wished to talk to them?
23        A    I said, I'm willing to answer your
24   questions, but then I told them I was going to take
```

```
                                                                83
 1   the Fifth, uh, when we entered the grand jury room.
 2   This is the same day of my grand jury appearance.
 3        Q    I understand.
 4        A    All right.
 5        Q    So did you --
 6        MS. MOBLEY:  I need to change the tape.
 7        MR. TAYLOR:  What?
 8        MS. MOBLEY:  I need to change the tape.
 9        MR. TAYLOR:  Okay.  Well, shall we take a
10   break, or do you guys want to keep going?
11        MR. SOTOS:  That's fine.
12        MR. TAYLOR:  Why don't we take a five or
13   ten-minute break.
14        MS. MOBLEY:  We're going off the record at
15   11:45 a.m.
16             (WHEREUPON, there was a brief
17              recess had in the proceedings.)
18             We're back on the record at 12:08 p.m.
19        MR. TAYLOR:  Okay.  I want to go back to
20   Plaintiff's Exhibit 5 -- or is it 6, the last one?
21        MS. REPORTER:  The last one is 6.
22   BY MR. TAYLOR:
23        Q    6.  Now, this memo from Boyle
24   apparently to the file concerning the Tuesday, August
```

```
                                                                84
 1   24th, meeting you had with him, was -- was Egan there
 2   as well?
 3        A    Yes.
 4        Q    Okay.  Was Murtaugh there?
 5        A    No.
 6        Q    Now, this memo indicates that you told
 7   him that you went to talk to me earlier, right?
 8        A    Yes.
 9        Q    And did you actually tell Boyle that?
10        A    Yes.
11        Q    All right.  And -- and it says that
12   you attempted to convince Mr. Taylor that he had
13   nothing to do with the civil -- that -- meaning --
14   "he," meaning you, I assume, had nothing to do with
15   the civil rights case and should be dismissed.
16   You --
17        A    Right.
18        Q    -- told him that; is that right?
19        A    That was the Aaron Patterson case --
20        Q    Right.
21        A    -- he's referring to.  He didn't name
22   Patterson in this, but that's the case he's talking
23   about.
24        Q    Right.  Now, in fact, you had put
```

**Page 129**

contact you or an attorney acting on your behalf and ask you to waive the statute of limitations with regard to your testimony on -- of March 1st, 19 -- 2001?

A   My only contacts from the special prosecutor's office, there were two. The June 12th, 2003, letter asking me to contact George Murtaugh, and the subpoena I received to appear before the special grand jury on August 24th, '04. There were no other contacts from the special prosecutor's office.

Q   So the answer to my question is, no, they didn't contact you about any waiver; is that right?

A   That is correct.

Q   And they didn't talk to you about that when you met with them in 2003; is that fair to say? That -- that topic didn't come up, right?

A   That's correct.

Q   All right. If they had told you that they would -- were going to indict you for your testimony of March 1st, 2001, at any time prior to March of 2004 unless you waived the statute of limitations, would you have so waived?

**Page 130**

MR. LEVY: Objection. Calls for speculation.

THE WITNESS: Would I have waived the statute of limitations?

BY MR. TAYLOR:

Q   Right.

A   If they had told me they were going to indict me?

Q   If you didn't.

MR. SOTOS: Same objection. Speculation.

THE WITNESS: Well, that's kind of a tough question. I -- you know, if they would have told me they were going to indict me based on what I told you on March 1st, 2001, over three hours and 20 minutes of testimony in your deposition, I would have said, go ahead and indict me because I told the truth, I have nothing to hide.

BY MR. TAYLOR:

Q   So -- so you would have not asked them or -- or assented to a waiver?

A   No. There's no reason to. I did nothing wrong.

Q   Okay.

A   I had no, uh, fear that I was going to be indicted over my testimony in that March 1st,

**Page 131**

2001, deposition.

Q   Did you know that one of the points in the petition to the special prosecutor made by the petitioners who -- who were successful in getting him, or they, appointed was your testimony?

A   No.

Q   Now, when -- did you have any understanding as to whether what you told the special prosecutors as public officials investigating cr -- purported crimes, whether what you told them not under oath could have formed the basis of an obstruction of justice?

A   Can you repeat that question, please.

(WHEREUPON, the Record was read as follows:

"Question: Did you have any understanding as to whether what you told the special prosecutors as public officials investigating purported crimes, whether what you told them not under oath could have formed the basis of an obstruction of justice?")

**Page 132**

MR. LEVY: I'll object in that it calls for speculation and legal conclusions.

THE WITNESS: I didn't think about that.

BY MR. TAYLOR:

Q   All right.

A   I wasn't concerned with it, I wasn't worried about it.

Q   Well, then why didn't you just testify?

MR. LEVY: Objection. Argumentative.

THE WITNESS: When?

BY MR. TAYLOR:

Q   When you went in front of the grand jury.

A   Because I chose at that time to not expose myself to the liabil -- to the possibility of a criminal indictment.

Q   Did you see a distinct -- did you make in your mind a distinction between talking to the special prosecutors in an interview and talking to the grand jury under oath in terms of your exposure for indictment?

A   Well, there's obviously a distinction there. First of all, one is informal, the other is

153

1  A    I didn't --
2  MR. LEVY: Objection.
3  THE WITNESS: -- know.
4  MR. LEVY: It's the same question, rephrased.
5  THE WITNESS: I didn't know. My intention
6  when I went in and sat down in the special grand jury
7  was to answer the questions put to me.
8  BY MR. TAYLOR:
9  Q    By taking the Fifth?
10 A    Well, after giving my name and my
11 assignment, yes, taking the Fifth as to substantive
12 questions.
13 Q    Were you concerned at all about
14 whether you were a target?
15 MR. LEVY: Objection.
16 THE WITNESS: I don't think so.
17 BY MR. TAYLOR:
18 Q    Did you have --
19 A    I really wasn't worried about the
20 special prosecutor, uh, because I knew I had done
21 nothing wrong. Uh, no, I wasn't worried.
22 Q    So if you weren't a target, then there
23 would have been no reason not to testify, would
24 there?

154

1  A    Well, I didn't say --
2  MR. LEVY: Objection. It's argumentative.
3  THE WITNESS: -- I wasn't a target I never
4  said I wasn't a target. I didn't know if I was a
5  target, but I wasn't worried about being a target if,
6  in fact, they viewed me as one.
7  BY MR. TAYLOR:
8  Q    All right. I'm just having a little
9  trouble understanding your thought process here.
10 If -- if you weren't worried about being a target,
11 why didn't you testify?
12 A    Because, as I've said about six times
13 now, I made a decision not to expose myself to the
14 possibility of a criminal indictment.
15 Q    But you weren't worried.
16 MR. LEVY: Objection. This is argumentative,
17 and it's been asked and answered on about ten
18 separate occasions.
19 THE WITNESS: I wasn't worried about being a
20 target. There's no sense in worrying about being a
21 target. What is worrying going to accomplish?
22 BY MR. TAYLOR:
23 Q    Well, were you -- did you believe that
24 you were a target?

155

1  MR. LEVY: Objection.
2  MR. SOTOS: It's asked and answered, too. I'm
3  really having a hard time seeing the point of all
4  this.
5  THE WITNESS: I had no basis to form a belief
6  one way or the other because I was not privy to the
7  special prosecutor's knowledge and the depth of his
8  investigation.
9  BY MR. TAYLOR:
10 Q    All right. Let's turn to page 8 here,
11 the bottom of page 7. You were sworn in in front of
12 the grand jury; is that right?
13 A    Yes, sir.
14 Q    And then Mr. Egan questioned you; is
15 that right?
16 A    Yes.
17 Q    And you gave your name and the fact
18 that you were a police -- you worked with the police
19 department; is that right?
20 A    Yes, sir.
21 Q    And then they asked you whether you
22 participated in the investigation of the Mahaffey
23 brothers; is that right?
24 A    Yes.

156

1  Q    And you took the Fifth Amendment; is
2  that --
3  A    Yes.
4  Q    -- right? Now, did they ask you in
5  the -- did they also ask you in the prior hour-long
6  discussion you had with them before you went in front
7  of the grand jury about the Mahaffey brothers?
8  MR. LEVY: Objection. Asked and answered.
9  THE WITNESS: I don't recall, uh, you know, on
10 that. I don't know. I -- I would be only
11 speculating. I don't recall. They asked -- they
12 tossed out a bunch of names, I answered all their
13 questions truthfully. I don't recall.
14 BY MR. TAYLOR:
15 Q    Well, did they -- then they asked you
16 about Stanley Howard, the next question, and you take
17 the Fifth; is that right?
18 A    That's correct.
19 Q    Did they ask you in the prior
20 interview they had with you about Stanley Howard and
21 whether you were involved in torturing him?
22 MR. LEVY: Same objection.
23 THE WITNESS: They might have. I don't
24 recall.

181

1 switched gears. Now you're talking about his civil
2 deposition?
3     MR. TAYLOR: Yes.
4     MR. SOTOS: Okay.
5     THE WITNESS: I chose -- say -- I'm sorry.
6 BY MR. TAYLOR:
7     Q    You chose not to expose yourself to
8 possible perjury or obstruction of justice charges by
9 taking the Fifth Amendment in the civil cases in July
10 and August of 2004, right?
11     A    Yes. I chose -- by taking the Fifth
12 Amendment, my reason was to not expose myself to that
13 possibility --
14     Q    And at about the same time --
15     A    -- of a criminal indictment.
16     Q    -- you chose to not expose yourself to
17 possible criminal liability for perjury and
18 obstruction of justice by testifying in front of the
19 grand jury, so you took the Fifth there as well; is
20 that right?
21     A    Well, that's what I'm talking about.
22 August 24th, 2004, that's the day I made the decision
23 to take the Fifth at the special grand jury so as to
24 not expose myself to the possibility of a criminal

BREHON REPORTING (708) 788-9040

182

1 indictment.
2     Q    But that same day and the day after,
3 you made a decision also to expose yourself to
4 possible indictment for obstruction of justice by
5 giving a nonsworn statement and offering to give
6 another one; isn't that right?
7     MR. LEVY: Objection. Argumentative.
8 BY MR. TAYLOR:
9     Q    Is that fair to say?
10     MR. LEVY: Asked and answered.
11     THE WITNESS: Yeah. Well, if the question is
12 I chose on the 24th or a day or two thereafter to go
13 ahead and answer questions not under oath, thereby
14 exposing me to the possibility of a criminal
15 indictment, yes, that's -- that's a fair statement.
16 BY MR. TAYLOR:
17     Q    And as you sit here and testify today
18 and make denials with regard to the allegations of
19 torture against you, you are making that decision and
20 giving those answers, being fully aware that you may
21 expose yourself to potential criminal liability with
22 regard to the federal government; is that fair to
23 say?
24     A    Sure.

BREHON REPORTING (708) 788-9040

183

1     Q    And you made that decision knowing
2 that that's a possibility; is that right?
3     A    Yes.
4     Q    Okay. And calling your attention back
5 to the memo for a moment and looking at the paragraph
6 where you made your offer about giving the
7 court-reported statement, you say, "And, most
8 importantly, to determine the credibility of all,"
9 italicized, "witnesses, included (sic), but not
10 limited to, Gregory Banks." Now, why did you single
11 out Gregory Banks in that particular offer?
12     A    Well, I believed that Gregory Banks'
13 allegations, the credibility, his credibility, as to
14 the allegations he made against me, would be
15 particularly suspect, and his credibility wouldn't be
16 very good because after I left the police department,
17 I represented Gregory Banks on a burglary charge. He
18 called me to represent him on a burglary charge. So
19 the inference would be if I did all these ter --
20 terrible things to Gregory Banks, why would he have
21 me represent him on a burglary charge when I left the
22 police --
23     Q    Did you tell --
24     A    -- department?

BREHON REPORTING (708) 788-9040

184

1     Q    Did you tell the special prosecutor
2 that?
3     MR. LEVY: Objection to relevance. You don't
4 know whether he was asked.
5     THE WITNESS: I don't recall if I was asked
6 that. I -- this is -- I would have told him had the
7 special prosecutor taken me up on this offer. I
8 would have. But, as I stated previously -- I'm
9 sorry.
10     MR. BOWMAN: Finish your answer.
11     THE WITNESS: Oh. As I stated previously, I
12 don't recall specifically what they asked me. I
13 remember names popping up, and if they asked me -- if
14 I participated in or had any knowledge of any torture
15 to these individuals whose names we went over in that
16 room prior to, uh, my testifying -- or my taking the
17 Fifth on August 24th, 2004, uh, I don't recall them
18 asking specific questions about that. So I don't
19 know if they asked me -- I don't know if I told them
20 about Gregory Banks or not.
21 BY MR. TAYLOR:
22     Q    Before you just testified about
23 representing Gregory Banks here today, have you ever
24 told anyone under oath that you represented Gregory

BREHON REPORTING (708) 788-9040

# EXHIBIT D

# PEOPLE'S LAW OFFICE

1180 N. Milwaukee
Chicago, Illinois, 60622
(773) 235-0070
Fax (773) 235-6699

PeoplesLaw@aol.com

Michael E. Deutsch
Ben H. Elson
Janine L. Hoft
Joey L. Mogul
John L. Stainthorp
Jan Susler
G. Flint Taylor, Jr.
Erica L. Thompson

*Of Counsel*
Jeffrey H. Haas

February 27, 2007

Richard T. Sikes Jr
Richard Levy
Terrence Sheahan
Freeborn and Peters
311 S. Wacker Drive
Chicago. Il. 60606

*Hobley v. Burge*
*Orange v. Burge*
*Howard v. City of Chicago*

James G. Sotos
Elizabeth Ekl
Sotos and Associates
550 E. Devon Suite 150
Itasca, Il. 60143

*Via e-mail and Fax*

Dear Counsel:

     As you learned at the February 13, 2007 status hearing with Judge Aspen, the City has in bad faith refused to honor an agreement to settle the three above-styled cases on behalf of your clients which was orally entered into in early November of 2006. The factual details are contained in our motion to enforce the settlement and for sanctions and our supporting memorandum. We believe that this settlement is in your clients' best interest for several reasons:

1. Your clients avoid liability, as well as the possibility of punitive damages, which would come from their own pockets;

2. Your clients, who have recently repudiated their prior assertions of the Fifth Amendment, avoid having to give further denials under oath at depositions and trials, thereby avoiding creating further evidence in support of a possible federal indictment, *inter alia*, for perjury, RICO, obstruction of justice, and conspiracy;

3. Your client Jon Burge avoids asserting the Fifth Amendment at trial, which assertion would make him even more vulnerable to an assessment of punitive damages against him;

4. Your clients avoid the possibility of having to hire their own lawyers if certain City Council members are successful in their attempt to divest them of their publicly financed lawyers;

5. Your clients lessen the risk that their pensions will be attacked in separate litigation;

6. Your clients avoid the further public attention, ridicule and opprobrium that would arise at a public trial where they either deny knowledge of, or participation in, a pattern of torture, or take the Fifth Amendment on those subjects in the face of more than 100 cases of torture and public opinion that overwhelmingly accepts that systemic torture did occur.

We believe that your clients' interest in settling these cases is now in obvious conflict with that of the City and its Mayor. Please advise your clients of our request to join us in our motion to enforce this settlement.

Sincerely yours,

cc: Joseph Roddy

/s/G. Flint Taylor
G. Flint Taylor
Michael Deutsch
Joey Mogul
Ben Elson
Peoples Law Office
1180 N. Milwaukee Ave
Chicago, IL 60622

Professor J. Sam Tenenbaum
Bluhm Legal Clinic
Northwestern University Law School
357 E. Chicago Ave.
Chicago, IL 60611

/s/ Jon Loevy
Jon Loevy
Kurt Feuer
Jon Rosenblatt
Loevy and Loevy
312 N. May Street
Chicago, IL 60607

Professor Andrea Lyon
Center for Justice in Capital Cases
DePaul University College of Law
Chicago, IL 60604